## ANTOLISH v. PAUL et al.

(Circuit Court of Appeals, Seventh Circuit. May 18, 1922.)

### No. 3045.

1. **Habeas corpus ☞25(1)—Unfairness of deportation hearing as ground for habeas corpus.**

    Where, in proceedings for deportation before executive officers, defendant was represented by counsel, and the facts were practically undisputed, claimed unfairness in the hearing or want of due process are immaterial as a basis for discharging defendant on a writ of habeas corpus.

2. **Habeas corpus ☞25(1)—Order of deportation, supported by evidence, not reviewable on habeas corpus.**

    Where the executive tribunals had any basis in the evidence for the exercise of their judgment, and the only question is the weight of the evidence, an order of deportation, approved by the Secretary of Labor, is unassailable on habeas corpus.

3. **Aliens ☞53—Order of deportation of aliens for membership in Communist party held sustained by evidence.**

    Evidence that aliens were members of the Communist Party, and of the purposes and methods of such party, *held* to sustain an order for their deportation as members of and affiliated with an organization that entertains a belief in, and teaches and advocates, the overthrow by force or violence of the government of the United States, within Act Oct. 16, 1918 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]).

Appeal from the District Court of the United States for the Eastern District of Wisconsin; Ferdinand A. Geiger, Judge.

Habeas corpus by John Antolish against Charles H. Paul and Robert Buech. Writ discharged, and petitioner appeals. Affirmed.

The opinion of the trial court is as follows:

These several cases are before the court upon writs of habeas corpus, sued out to challenge the efficacy of proceedings taken by the government, through the Secretary of Labor, for the deportation of the petitioners under the Act of October 16, 1918 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]). That act defines, as subject to deportation, "aliens who are anarchists; aliens who believe in or advocate the overthrow by force or violence of the government of the United States or of all forms of law; aliens who disbelieve in or are opposed to all organized government; aliens who advocate or teach the assassination of public officials; aliens who advocate or teach the unlawful destruction of property; aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

overthrow by force or violence of the government of the United States or of all forms of law, or that entertains or teaches disbelief in or opposition to, all organized government, or that advocates the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the government of the United States or of any other organized government, because of his or their official character, or that advocates or teaches the unlawful destruction of property." Section 4289¼b(1).

The questions pertain: (1) To the character of the hearing accorded to the respective petitioners by the executive tribunal constituted by the law; and (2) to the substantive case shown by the records before us.

[1] The first question seems not to have been raised, or at least not seriously urged, prior to the presentation and argument in court, and in fact now, in the estimate of counsel for the petitioners does not seem to have an aspect entitling it to serious consideration. It may be assumed that the Executive Department, when acting under laws committing to it subject-matter such as dealing with aliens, must observe prescribed limitations in the manner of proceeding; that taking into custody and holding an alien requires some sort of a warrant for justification; and that, generally, due heed be given to the dictates of common fairness in the enforcement of the law. But whatever criticism may justly be made in other situations respecting custody without warrant seems not to require consideration in the cases before us; for it is true, whether we inquire on behalf of each petitioner if a warrant was in possession of the officers at the time of apprehension, the cases are before us upon practically uncontroverted facts which are essential to deal with the fundamental question respecting the status of each of the petitioners as bringing him within, or leaving him without, the law in question. It is true that, when each of the petitioners had his hearing before the executive official, he was accorded the privilege, and in fact had assistance, of counsel. It is true that upon the hearing the fundamental fact of membership of the individual in the alleged inhibited organization was established, in part, at least, by the introduction of a membership card doubtless found in his possession; but it is equally true that upon the executive hearing, as well as in this court (where, at petitioners' request, further evidence was permitted to be introduced to support the claim of unfairness of procedure), each of the petitioners freely and unreservedly admitted the facts respecting membership.

Above all this, no suggestion has been, or can be, made that the facts so testified to, either upon hearing before the inspector, or before this court, are not the truth, or that anything has intervened, procedurally or otherwise, which led to or in any way impugns the conclusion—itself now admitted—that the petitioners were and are severally members of an organization whose status was required to be determined by the executive tribunal. Upon this aspect of the case, therefore, the court, through the efforts of both the government and the petitioners, is in possession of the truth. Whether the present writs be upheld or discharged will make no difference. A second proceeding by the executive will either start with or will speedily result in the establishment of, the truth of the petitioners' membership in the organization. As suggested on the argument, it would seem idle, in the absence of some showing of other unfairness, that the court should now hold these hearings to have been unfair.

[2] Therefore the court may well consider what has been discussed as the dominant question, namely, the tenability of the order for deportation upon the record before the Secretary of Labor. It is, of course, elementary that this consideration must proceed within close compass; that, if the executive tribunal had any basis upon which to exercise its judgment, it is not for the court to review and to revise that judgment by rebalancing the testimony, even if the court be of opinion that upon the same testimony, or upon the same bases, it might have reached a contrary view. In other words, the single inquiry is whether in the record there is any basis for the executive judgment, upon conflict, may find favor or disfavor. Or, putting it in another way, the court may say that the record may support the view urged by the

petitioners, but, unless and until it can be said that the view taken by the Secretary of Labor is destitute of any support, the conclusion reached by him as the executive agency is none the less unassailable upon habeas corpus.

This brings us directly to a consideration of what the record discloses, and the matter may be considered briefly in two aspects: (1) The objective of the organization; and (2) the means for attaining the objective, as disclosed in the announcements emanating from the organization. Obviously there is comprehended in this manner of consideration the possible concession that the objectives, if broadly stated, may appear to be innocent; but, secondarily, a contrary color may be given to such objectives by asserted means, for example revolutionary means, which latter may themselves be regarded as a purpose or objective of the organization. Really, when essentials are considered, it then becomes quite immaterial, if we say that laudable objects, broadly speaking, are to be attained by means, belief in, or the teaching or preaching of, or resort to, which is condemned by the statute. So we are brought to a consideration, not as a mere matter of lexicography of words used by the Communist party and its adherents, in their oral and written utterances, but rather of the understanding in the minds of those who receive them. This, obviously, does not require a finding, for example, that the language about to be referred to may have a figurative meaning, and may imply force; because, beyond that, it has a recognized and ordinary nonmetaphorical meaning.

It is not for the court to say that the executive was not charged with the responsibility—at the very least—of making a choice between the two; and, obviously, the court cannot say, in view of the executive's responsibility, that the one rather than the other is the more plausible. So, if we start with the suggestion that the Communist party may have charged itself with a mission to regenerate humanity politically, socially, and economically, the executive, under the statute, was required, conceding the laudability of the objective, to inquire none the less whether such was the true objective, and whether the means to be resorted to in attaining the objective, whatever it be, did not show the organization to be such as the statute defines. In answering this query, the teaching, advocacy, and belief of an organization such as is the one in question are usually pretty clearly disclosed by oral or written declarations, whether they be called constitutions, manifestos, programs, or literature.

[3] When, therefore purposes and methods are announced which indicate an overthrow of society and government as now organized, constituted or claimed to be dominated, in language such as by "direct action," by "mass action," by "revoluntionary mass action," suggesting "the army of the proletariat," the "revolutionary soldiers," the "red guard," the use of all means of "battle," direct conflict with governmental machinery in open combat, and the like, the query at once arises whether such language is fairly susceptible of a meaning which necessarily excludes all but peaceable or persuasive means and necessarily suggests repugnance to force or violence, or that it excludes any idea except a change so peaceable, yet so certain, that the transition from the old to the new era will come about with a sort of gradual spontaneity; the old quite willingly receding before the new. It suffices to accept the concession, made by counsel upon argument, that it is hardly fair to ascribe to such language a meaning so exceedingly mild. In other words, the concession was made that, of necessity, the means to be used, if success is to be achieved, involve the use of force if and whenever other means prove unavailing.

These considerations require that the several writs be discharged and that the petitioners be remanded to custody under the executive warrants.

A. W. Richter, of Milwaukee, Wis., for appellant.

David A. Sondel, of Milwaukee, Wis., for appellees.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

PER CURIAM. On the opinion of Judge Geiger in this case, which was filed on August 16, 1921, and the opinion of the Circuit Court of

Appeals for the First Circuit, rendered on January 11, 1922, and reported in Skeffington v. Katzeff et al., 277 Fed. 129, dealing with the same issues of law and fact, the decision is affirmed.