**BARSKY et al. v. UNITED STATES.**
No. 9602.

United States Court of Appeals
District of Columbia.

Argued Nov. 24, 1947.

Decided March 18, 1948.
Writ of Certiorari Denied June 14, 1948.
See 68 S.Ct. 1511.

**EDGERTON, Associate Justice, dissenting.**

See also 72 F.Supp. 165.

Mr. O. John Rogge, of Washington, D. C., for appellants. Mr. Osmond K. Fraenkel, of New York City, of the Bar of the State of New York, pro hac vice, by special leave of court, also argued for appellants.

Mr. Charles B. Murray, Asst. U. S. Atty., of Washington, D. C., with whom Mr. George Morris Fay, U. S. Atty. and Messrs. John P. Burke and Sidney S. Sachs, Asst. U. S. Attys., both of Washington, D. C., were on the brief, for appellee.

Mr. Belford V. Lawson, Jr., of Washington, D. C., filed a brief on behalf of the National Lawyers Guild as amicus curiæ, urging reversal.

Before EDGERTON, CLARK and PRETTYMAN, Associate Justices.

**PRETTYMAN, Associate Justice.**

The Supreme Court has denied certiorari, 1948, —— U.S. ——, 68 S.Ct. 609, in United States v. Josephson, 2 Cir., 1947, 165 F. 2d 82. Nevertheless, because of the nature of the question involved and because we have a division of opinion, we state in full the reasons for our conclusion.

These appellants were indicted, tried before a jury, convicted, and sentenced for willful failure to produce records before a committee of the Congress pursuant to subpœnas, in violation of Section 192 of Title 2 of the United States Code Annotated.[1] The indictment alleged that appellants were members of the governing body of an unincorporated association known as the Joint Anti-Fascist Refugee Committee and that, having been subpœnæd by the Congressional Committee known as the Committee on Un-American Activities of the House of Representatives, to produce the records of their association relating to the receipt and disbursement of certain money and certain correspondence with persons in foreign countries, they willfully failed to produce those documents.[2]

Upon the trial it was shown that the Congressional Committee existed by virtue of House Resolution No. 5 of the 79th Congress,[3] and that the Joint Anti-Fascist Refugee Committee was a private voluntary association engaged in the collection of funds from the public in this country upon representations that such funds were to be used for relief purposes abroad, and in the disbursement of those funds in foreign countries. It was further shown that the Congressional Committee had received "a large number" of complaints that the funds collected by appellants' organization were being used for political propaganda and not for relief. It made inquiry of the Presi-

---

[1] 1938, 52 Stat. 942.

[2] The indictment, in another count, also charged the defendants with conspiracy to defraud the United States and willfully to make default of the subpœnas of the Congressional Committee, but the trial court directed entry of judgment of acquittal upon that count, and so that feature of the original case is not before us.

[3] 79th Cong., 1st Sess., 90 Cong.Rec. 10, 15 (1945). The Resolution was carried into the Rules of the House as Rules X(a)-17 and XI(q)-1 and into the Legislative Reorganization Act of 1946, 60 Stat. 812, 828.

dent's War Relief Control Board and, consistently with suggestions there obtained, requested that one of its investigators be permitted to examine the records of the collection and disbursement of the funds. This request was denied. Testimony, including that of an official of the State Department and a person who said that she had observed the operation of appellants' association abroad, was taken. In effect, this testimony sustained the burden of the complaints. Thereupon the Committee issued the subpœnas above described. Appellants appeared before the Committee but declined to produce, or to cause the production of, the described books and documents. They were thereupon indicted, as above described, and appeal from the judgments upon conviction.

Appellants' first point is that the Resolution creating the Congressional Committee was unconstitutional because it authorized inquiry into political opinion and expression, in violation of the First Amendment.

The Resolution which created this Congressional Committee authorized it by one of three subclauses to investigate "the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution".

■ These appellants were not asked to state their political opinions. They were asked to account for funds. We are unable to visualize the particular in which civil rights are violated by a requirement that persons who collect funds from the public in this country for relief purposes abroad account for the collection and distribution of such funds. Moreover, the fact of the existence of such official bodies as UNRRA and the President's War Relief Control Board, and the then-pending proposals for loans to foreign governments, clearly justified Congressional inquiry into the disbursement abroad of private funds collected in this country avowedly for relief but reasonably represented as being spent for political purposes in Europe.

Appellants' point is not premised upon the specific question asked them but upon the scope of possible inquiry under the Resolution. So we examine the contention in the light of the possibility, indicated by the preliminary data before the Committee, that answers to the inquiry might reveal that appellants were believers in Communism or members of the Communist Party.

The problem thus presented is difficult and delicate. In it we have not only the frequent "real problem of balancing the public interest against private security",[4] but in this instance we must do so in the midst of swirling currents of public emotion in both directions. We are presented with extreme declarations in respect to Communists and equally extreme declarations in respect to the Congressional Committee. The duty of the courts is no less than to render judgment with utter detachment.

Congressional powers of investigation have been explored and debated by scholars for many years in the United States and other countries.[5] We shall not venture upon a treatise on the subject but confine ourselves to the specific question before us. Nor shall we elaborate by discussion the principles we deem controlling. We state them and leave support of them to the authorities cited.

■ We think that even if the inquiry here had been such as to elicit the answer

---

[4] Mr. Justice Rutledge, in Oklahoma Press Pub. Co. v. Walling, 1946, 327 U. S. 186, 203, 66 S.Ct. 494, 502, 90 L.Ed. 614, 166 A.L.R. 531.

[5] Some outstanding examples, which include many other references, are: Ehrmann, The Duty of Disclosure in Parliamentary Investigation, 11 Chi.L.Rev. 1, 117 (1943); Gose, The Limits of Congressional Investigating Power, 10 Wash. L.Rev. 61 (1935); Hamilton, The Inquisitorial Power of Congress, 23 A.B.A. J. 511 (1937); Comment, 19 Ill.L.Rev.

452 (1925); Loring, Powers of Congressional Investigation Committees, 8 Minn. L.Rev. 595 (1924); Coudert, Congressional Inquisition vs. Individual Liberty, 15 Va.L.Rev. 537 (1929); Stebbins, Limitations of the Powers of Congressional Investigating Committees, 16 A.B.A.J. 425 (1930); Herwitz and Mulligan, The Legislative Investigating Committee, 33 Col.L.Rev. 4 (1933); Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 153 (1926).

that the witness was a believer in Communism or a member of the Communist Party, Congress had power to make the inquiry.

The first phase of the question thus posed concerns the power of the Congress to inquire into the subject described in the above quotation from the Resolution.

 Preliminary inquiry has from the earliest times been considered an essential of the legislative process.[6] By it are to be determined both the advisability for and the content of legislation. So that even as to ordinary subjects, the power of inquiry by the legislature is coextensive with the power of legislation and is not limited to the scope or the content of contemplated legislation. Constitutional legislation might ensue from information derived by an inquiry upon the subject described in the quotation from H.R.Res. No. 5. That potentiality is the measure of the power of inquiry.[7] The fact is that at least eight legislative proposals have been submitted to the Congress by this Committee as the result of its investigations.[8] Obviously, the possibility that invalid as well as valid legislation might ensue from an inquiry does not limit the power of inquiry; invalid legislation might ensue from any inquiry.

██ The permissible breadth of governmental investigation was indicated many years ago when the Supreme Court held that "the requiring of information concerning a business is not regulation of that business",[9] and refused to confine investigation to activities which might be regulated. And

that breadth has increased considerably in recent years.[10] The Supreme Court has recently held [11] that the First Amendment does not preclude a subpœna by an administrative official requiring a newspaper to disclose the interstate distribution of its paper, dissemination of its news, or the source and receipt of its advertisements; [12] that it is not necessary that a charge of violation of law be pending, or that the inquiry be limited by "forecasts of the probable results of the investigation". The official might, the Court held, make "preliminary investigation of possibly existing violations", so long as the investigation be for a lawfully authorized purpose within the power of Congress to command. The power of Congress to investigate by means of a Committee of its own can be no less restricted than the power which it may validly confer upon an administrative official. In the case at bar we do not approach the wide boundaries indicated by the Supreme Court in that case.

Moreover, the power to inquire into the subject described in this Resolution rests upon a foundation deeper than a mere auxiliary to the ordinary legislative or administrative process. Direct reference to fundamentals is justified in this connection.

The basic concept of the American system, both historically and philosophically, is that government is an instrumentality created by the people, who alone are the original possessors of rights and who alone have the power to create government.[13] The choice of the existing form of government was by the people, and resulted from a

[6] Fields v. United States, 1947, 82 U. S.App.D.C. 354, 164 F.2d 97, and authorities there cited; Landis, supra note 5.

[7] McGrain v. Daugherty, 1927, 273 U. S. 135, 177–179, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1.

[8] H. R. Rep. No. 2742, 79th Cong., 2d Sess. (1947).

[9] Interstate Commerce Commission v. Goodrich Transit Co., 1912, 224 U.S. 194, 211, 32 S.Ct. 436, 440, 56 L.Ed. 729, 736.

[10] See the exhaustive study of the cases in Davis's "The Administrative Power of Investigation" in the Yale Law Journal, Vol. 56, p. 1111 (1947).

[11] Oklahoma Press Pub. Co. v. Walling, 1946, 327 U.S. 186, 66 S.Ct. 494, 509, 90

L.Ed. 614, 166 A.L.R. 531. See also United States v. Darby, 1941, 312 U.S. 100, 124, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

[12] Oklahoma Press Pub. Co. v. Walling, 10 Cir., 1945, 147 F.2d 658, 659.

[13] 1 DeTocqueville, Democracy in America, c. 4 (1875); 1 Bryce, The American Commonwealth, c. 3 (1923); 2 Id. c. 77; Woodrow Wilson, Character of Democracy in the United States, and Government Under the Constitution, in Selected Literary and Political Papers, Vol. III; Hicks, The Federal Union, c. 9 (1937); Curtis, Constitutional History of the United States, cc. 18, 19, 32 (1889); Beck, The Constitution of the United States, c. 17 (1925).

conviction on their part that it was the best for the purposes of government. That this was a deep conviction and not a temporary fancy is evidenced conclusively by even a casual examination of the historical facts, beginning with the original settlements and extending through the adoption of the Federal Constitution. The prime function of government, in the American concept, is to preserve and protect the rights of the people. The Congress is part of the government thus established for this purpose.

■■ This existing machinery of government has power to inquire into potential threats to itself, not alone for the selfish reason of self-protection, but for the basic reason that having been established by the people as an instrumentality for the protection of the rights of people, it has an obligation to its creators to preserve itself. Moreover, the process whereby a change in the form of government can be accomplished has been prescribed by the people in the same document which records the establishment of the presently existing machinery, and that process requires the Congress to initiate proposed amendments.[14] We think that inquiry into threats to the existing form of government by extra-constitutional processes of change is a power of Congress under its prime obligation to protect for the people that machinery of which it is a part, and inquiry into the desirability vel non of other forms of government is a power of Congress under its mandate to initiate amendments if such become advisable.

■ Moreover, Congress is charged with part of the responsibility imposed upon the federal government by that clause of the Constitution which provides that "The United States shall guarantee to every State in this Union a Republican Form of Government * * *." Art. 4, § 4. This clause alone would supply the authority for Congressional inquiry into potential threats to the republican forms of the governments of the States.

■ If Congress has power to inquire into the subjects of Communism and the Communist Party, it has power to identify the individuals who believe in Communism and those who belong to the party. The nature and scope of the program and activities depend in large measure upon the character and number of their adherents. Personnel is part of the subject. Moreover, the accuracy of the information obtained depends in large part upon the knowledge and the attitude of the witness, whether present before the Committee or represented by the testimony of another. We note at this point that the arguments directed to the invalidity of this inquiry under the First Amendment would apply to an inquiry directed to another person as well as to one directed to the individual himself. The right to refuse self-incrimination is not involved. The problem relates to the power of inquiry into a matter which is not a violation of law.

■ The Congressional power of inquiry is not unrestricted.[15] One obvious limitation upon this particular sort of inquiry is that some reasonable cause for concern must appear. We are referred to the "clear and present danger" rule expressed by Mr. Justice Holmes in Schenck v. United States [16] and extending through the line of cases cited and discussed in Bridges v. State of California.[17] But all those cases dealt with statutes which actually imposed a restriction upon speech or publication. In our view, it would be sheer folly as a matter of governmental policy for an existing government to refrain from inquiry into potential threats to its existence or security until danger was clear and present. And for the judicial branch of government to hold the legislative branch to be without power

---

[14] We mean to be specific in this reference. We are dealing only with inquiry into forms and basic principles of government. We do not intend any inference as to powers incident to the initiation of other possible amendments.

[15] Kilbourn v. Thompson, 1881, 103 U. S. 168, 26 L.Ed. 377, lays down one rule of restriction, which, however, is applicable to an inquiry into subjects far distant from that here involved. See also McGrain v. Daugherty, supra note 7.

[16] 1919, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, 473.

[17] 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; see also Thomas v. Collins, 1945, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430.

to make such inquiry until the danger is clear and present, would be absurd. How, except upon inquiry, would the Congress know whether the danger is clear and present? There is a vast difference between the necessities for inquiry and the necessities for action. The latter may be only when danger is clear and present, but the former is when danger is reasonably represented as potential.

There was justification here, within the bounds of the foregoing restriction, for the exercise of the power of inquiry. The President, pursuant to the constitutional requirement that "He shall from time to time give to the Congress Information of the State of the Union" (Art. II, Sec. 3), has announced to the Congress the conclusion that aggressive tendencies of totalitarian regimes imposed on free peoples threaten the security of the United States,[18] and he mentioned the activities of Communists in that connection. That proposition underlies much of the current foreign policy of the Government.[19] It is also the premise upon which much important legislation is now pending. These culminations of responsible governmental consideration sufficiently demonstrate the necessity for Congressional knowledge of the subject and so justify its course in inquiring into it.

 Moreover, that the governmental ideology described as Communism and held by the Communist Party is antithetical to the principles which underlie the form of government incorporated in the Federal Constitution and guaranteed by it to the States, is explicit in the basic documents of the two systems; and the view that the former is a potential menace to the latter is held by sufficiently respectable authorities, both judicial and lay,[20] to justify Congressional inquiry into the subject. In fact, the recitations in the opinion of the Supreme Court in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, are sufficient to justify inquiry. To remain uninformed upon a subject thus represented would be a failure in Congressional responsibility.

The next phase of the problem is whether the power of inquiry was validly delegated by the Congress to the Committee.

 It is said that the Resolution is too vague to be valid. Perhaps the one phrase "un-American propaganda activities", taken alone as it appears in subclause (i) of the Resolution, would be subject to that condemnation. But the clause, above-quoted, "subversive and un-American propaganda that * * * attacks the principle of the form of government as guaranteed by our Constitution", which is subclause (ii), is definite enough. It conveys a clear meaning, and that is all that is required. The principles which underlie the form of the existing government in this country are well-enough defined in basic documents

[18] Message of March 12, 1947, H. R. Doc. No. 171, 80th Cong., 1st Sess., 93 Cong. Rec. 1999–2000; Message of December 19, 1947, H. R. Doc. No. 478, 93 Cong. Rec. 11873 et seq.

[19] Speeches of Secretary of State George C. Marshall, at Harvard University on June 5, 1947, N. Y. Times, June 6, 1947, p. 2; at the General Assembly of the United Nations on Sept. 17, 1947, N. Y. Times, Sept. 18, 1947, p. 3; at Chicago, Ill., on Nov. 18, 1947, N. Y. Times, Nov. 19, 1947, p. 8; of Under Secretary of State Dean Acheson, at Middletown, Conn., on June 15, 1947, N. Y. Times, June 16, 1947, pp. 1, 3 (not in whole text).

[20] Gitlow v. People of State of New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Whitney v. People of State of California, 1927, 274 U.S. 357, 363 et seq., 47 S.Ct. 641, 71 L.Ed. 1095; Skeffington v. Katzeff, 1 Cir., 1922, 277

F. 129; Antolish v. Paul, 7 Cir., 1922, 283 F. 957; Ungar v. Seaman, 8 Cir., 1924, 4 F.2d 80; a symposium inserted in the Congressional Record, including statements by J. Edgar Hoover, William Green, William Z. Foster, John L. Lewis, Herbert Hoover, Adna Wright Leonard, Matthew Woll, and others (92 Cong. Rec. App. pp. A4117 et seq. (1946)); Spellman, Communism Is Un-American, 92 Cong. Rec. App. p. A4651 (1946); 25 Foreign Affairs 566 (July 1947); 25 id. 1 (Oct. 1946); 24 id. 290 (Jan. 1946); Lyons, Stalin (1940); Dallin, The Real Soviet Russia c. 5 (1947); Eastman, Stalin's Russia and the Crisis in Socialism (1940); Walsh, Fall of the Russian Empire (1928) and Last Stand (1931); 2 Informationes et Notitiae (Nov. 1936). Certainly the thesis of ultimate destruction of existing systems of government is in The Communist Manifesto.

preceding the Constitution,[21] are obvious in the undebated unanimity which prevailed on many basic propositions in the Convention of 1787,[22] were stated during the consideration of the adoption of the Constitution,[23] are stated in countless scholarly works upon principles of government,[24] and, indeed, are taught even to high school students in our schools. Aliens seeking naturalization are required to swear that they are "attached to the principles of the Constitution of the United States". 8 U.S. C.A. § 732(a) (17). If the part of the Resolution involved in the instant case be clear and certain, it is of no importance that another part, not here involved, is vague or uncertain.

Appellants argue that because the Resolution is not on its face directly and exclusively concerned with such activities as may be constitutionally restricted, it is unconstitutional. Cases are cited to the point,[25] but they are all criminal cases and dealt with the requirements in penal statutes. There is a difference between the particularity required in the specification of a criminal act and that required in the authorization of an investigation, as a comparative examination of the cases cited by appellants and the cases dealing with investigations, above mentioned, readily shows.

Appellants say that the vagueness of the Resolution made it impossible for them to determine with precision whether they could or could not lawfully refuse to answer questions which might be asked them. They say that they were liable for contempt only if they refused to answer a pertinent question and, therefore, had a right to know with precision what was pertinent, lest they unwittingly commit an offense. But pertinency relates to the particular question asked and not to unasked possibilities, and we have said enough to show that the question addressed to these appellants was pertinent to the subject described in the above-quoted sub-clause of the Resolution. The Supreme Court held in the Sinclair case[26] that the facts there sought were pertinent as a matter of law and that "He [the accused] was bound rightly to construe the statute."[27] Here, as in that case, "There was no misapprehension as to what was called for."

It is vigorously pressed upon us that the whole gamut of the rights of minorities to freedom of thought is involved in this case. The answer to that insistence is the simple fact that we are here considering a specific inquiry. The general question of minority rights is not here, and we will not generalize. We do not have before us the question of how much or how little a Congressional Committee can ask of a private citizen. Minorities are infinite in nature. Activity is different from thought. Any attempt to generalize that all minority right to thought or activity outweighs all public interest, or vice versa, would be impossible and the result unsound; at the least, it would be judicial obiter. Moreover, there is no such rule without exception. As thought and activity differ among minorities, so may their relative weight with the public interest differ. None of the fundamental rights is absolute; the public interest may under some circumstances outweigh even the right to life itself. It is so in respect to the right to freedom of speech. We are considering a specific question only, which is whether this Congressional Com-

---

[21] E. g., Declaration and Resolves of the First Continental Congress, Oct. 14, 1774; Declaration of Independence, July 4, 1776; the various colonial and state constitutions prior to 1787.

[22] Elliot's Debates, particularly Madison's Reports.

[23] The Federalist, particularly No. 38 et seq.

[24] See note 13 supra for a few examples.

[25] Thornhill v. State of Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carlson v. People of State of California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L. Ed. 1104; Lovell v. City of Griffin, 1938, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Herndon v. Lowry, 1937, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; Stromberg v. People of State of California, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484.

[26] Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 274, 73 L.Ed. 692.

[27] To the same effect is Townsend v. United States, 1938, 68 App.D.C. 223, 95 F.2d 352.

mittee may inquire whether an individual is or is not a believer in Communism or a member of the Communist Party. The answer depends upon the present nature of Communism and the Communist Party and its position in world and domestic affairs, as respectably indicated to the Congress. We are not here concerned with general rights or general powers.

Appellants argue that since an answer that the witness is a Communist would subject him to embarrassment and damage, the asking of the question is an unconstitutional burden upon free speech. It is no doubt true that public revelation at the present time of Communist belief and activity on the part of an individual would result in embarrassment and damage. This result would not occur because of the Congressional act itself; that is, the Congress is not imposing a liability, or attaching by direct enactment a stigma. The result would flow from the current unpopularity of the revealed belief and activity. Contra, it is suggested that since the pressure of unpopularity affects only sensitive or timid people, there need be less concern, on the theory that democratic processes must necessarily contemplate rugged courage on the part of those who hold convictions, or even beliefs, on government. But it is true, realistically, that even one fully equipped to formulate a personal preference for a system of government at odds in basic respects with that presently existing, may be deterred from his conclusion by fear of, or distaste for, the unpopularity attached to it. We proceed upon the theory that even the most timid and sensitive cannot be unconstitutionally restrained in the freedom of his thought. But this consideration does not solve the problem, because the problem is the relative necessity of the public interest as against the private rights. Even assuming private rights of the timid to be of the fullest weight, the problem remains whether they outweigh the public necessities in this matter.[28] That the protection of private rights upon occasion involves an invasion of those rights is in theory a paradox but, in the world as it happens to be, is a realistic problem requiring a practical answer.[29] That invasion should never occur except upon necessity, but unless democratic government (by which we mean government premised upon individual human rights) can protect itself by means commensurate with danger, it is doomed. That it cannot do so is the hope of its opponents, the query of its skeptics, the fear of its supporters. While we will not give less consideration to the private rights involved because they may be those of the more sensitive or less courageous, on the other hand we cannot say that merely because those affected are of less courage or greater sensitivity than the average, therefore the public interest must be waived or given less consideration.

It is urged by the appellee Government that freedom of speech does not encompass freedom to remain silent. There is justification for the contention that the latter is a freedom of privacy, different in characteristics and governed by different considerations from the constitutionally protected freedom of speech. At least, the basic public policies which underlie the two are different. The public policy which supports freedom of speech is that the safety of democratic government· lies in open discussion—discussion of grievances, remedies, of "noxious doctrine" as well as of

---

[28] Other requirements having similar restrictive effects upon the less hardy have been sustained in the public interest. For example, newspapers are required to publish their ownership, and to reveal the sources of. their income to governmental inspection. An interesting light upon these contentions is cast by the history of our method of elections. The right of a qualified citizen to vote as he pleases is certainly a fundamental right and is a basic concept in our system of government. Public voting subjected even the most hardy to pressure and also to violence. But it was never thought, or suggested, that public voting violated constitutional rights. The secret ballot does not seem to have appeared in this country until February, 1888, when the newly-devised Australian system was adopted for municipal elections in Louisville, Kentucky. On this subject see Wigmore's Australian Ballot System.

[29] West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 636, 637, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A. L.R. 674.

popular preferences.[30] The public interest in privacy, however, is premised upon the individual's right to the pursuit of happiness.[31] But we do not consider that question and do not rest this decision in any respect upon it. We assume, without deciding, for purposes of this case, that compulsion to answer the question asked by the Congressional Committee would impinge upon speech and not merely invade privacy.[32]

Appellants press upon us representations as to the conduct of the Congressional Committee, critical of its behavior in various respects. Eminent persons have stated similar views.[33] But such matters are not for the courts. We so held in Townsend v. United States,[34] citing Hearst v. Black.[35] The remedy for unseemly conduct, if any, by Committees of Congress is for Congress, or for the people; it is political and not judicial. "It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."[36] The courts have no authority to speak or act upon the conduct by the legislative branch of its own business, so long as the bounds of power and pertinency are not exceeded,[37] and the mere possibility that the power of inquiry may be abused "affords no ground for denying the power." [38] The question presented by these contentions must be viewed in the light of the established rule of absolute immunity of governmental officials, Congressional and administrative, from liability for damage done by their acts or speech, even though knowingly false or wrong.[39] The basis of so drastic and rigid a rule is the overbalancing of the individual hurt by the public necessity for untrammeled freedom of legislative and administrative activity, within the respective powers of the legislature and the executive.

We hold that in view of the representations to the Congress as to the nature, purposes and program of Communism and the Communist Party, and in view of the legislation proposed, pending and possible in respect to or premised upon that subject, and in view of the involvement of that subject in the foreign policy of the Government, Congress has power to make an inquiry of an individual which may elicit the answer that the witness is a believer in Communism or a member of the Communist Party. And we further hold that the provision we have quoted from House Resolution No. 5 is sufficiently clear, definite and authoritative to permit this particular Committee to make that particular inquiry. We hold no more than that.

We find ourselves in agreement with the

---

30 See Mr. Justice Brandeis, concurring in Whitney v. People of State of California, 1927, 274 U.S. 357, 375, 377, 47 S.Ct. 641, 71 L.Ed. 1095; dissenting in Pierce v. United States, 1920, 252 U.S. 239, 267, 270, 272, 40 S.Ct. 205, 64 L.Ed. 542, 555, 556, 557; Thornhill v. State of Alabama, supra note 25, 310 U.S. at pages 102, 103, 60 S.Ct. at page 744, 84 L. Ed. 1093.

31 See Mr. Justice Brandeis, dissenting in Olmstead v. United States, 1928, 277 U.S. 438, 473 et seq., 48 S.Ct. 564, 72 L. Ed. 944, 66 A.L.R. 376.

32 Schneiderman v. United States, supra, 320 U.S. at page 138, 63 S.Ct. at page 1343, 87 L.Ed. 1796; United States v. Ballard, 1944, 322 U.S. 78, 86, 87, 64 S.Ct. 882, 88 L.Ed. 1148.

33 E. g., Gellhorn, Report on a Report of the House Committee on Un-American Activities, 60 Harv.L.Rev. 1193 (1947); Letter to the President by Members of Yale Faculty of Law, 34 A.B.A. J. 15, 16 (1948).

34 Supra note 27.

35 1936, 66 App.D.C. 313, 87 F.2d 68.

36 Mr. Justice Frankfurter, concurring in United States v. Lovett, 1946, 328 U. S. 303, 319, 66 S.Ct. 1073, 1080, 90 L.Ed. 1252, quoting Mr. Justice Holmes in Missouri, K. & T. Ry. of Texas v. May, 1904, 194 U.S. 267, 270, 24 S.Ct. 638, 48 L.Ed. 971, 973.

37 McGrain v. Daugherty, supra note 7, 273 U.S. at pages 175, 176, 47 S.Ct. at page 329, 71 L.Ed. 580, 50 A.L.R. 1.

38 Id., 273 U.S. at page 175, 47 S.Ct. at page 329.

39 U.S.Const. Art. I, § 6; Kilbourn v. Thompson, supra note 15; Cochran v. Couzens, 1930, 59 App.D.C. 374, 42 F.2d 783, certiorari denied, 1930, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772; Spalding v. Vilas, 1896, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780; Glass v. Ickes, 1940, 73 App.D.C. 3, 117 F.2d 273, 132 A.L.R. 1328; Jones v. Kennedy, 1941, 73 App.D.C. 292, 121 F.2d 40.

Circuit Court of Appeals for the Second Circuit upon the foregoing phase of this case.[40]

Appellants' next point is that the trial court erred in refusing to admit evidence which they say tended to prove that the House Committee used its investigatory power in a politically discriminatory manner, and that the administration of the Resolution resulted in an illegal discrimination which amounted to an unequal protection of the laws. The evidence tendered would have shown, appellants say, that the Committee treated in different fashion other persons, such as Fascists, conservatives, reactionaries, and certain named individuals. We find no error in this ruling of the trial court. The mere attitude of the Committee is not for the court, and the fact that the Committee chose not, or chose not at the time, to inquire into other matters is not pertinent to the validity of its inquiry into this one. Classification is permitted even in statutes, and surely Congress had a broad power of selectivity in its investigations. The issue presented upon the trial in the present case was specific. At the very least, to support a claim of discrimination, evidence would have to be tendered that the other matters mentioned were equally as pertinent to the subject of the Resolution as was this subject, and that the Committee clearly and intentionally forbore from inquiry there to the detriment of appellants. Snowden v. Hughes,[41] cited to us by appellants in support of their position, does not seem to us to be in point.

We find no error in the trial court's characterization as "subpoenas" of the documents served upon appellants.

Appellants' next point is that the trial court erred in denying their motion for a directed verdict of acquittal, since there was no evidence that these appellants had "custody" of the documents sought; and also erred in charging the jury that among the elements which the Government must prove as to each defendant was "That the defendant, alone or in concert with one or more of the defendants, had custody or dominion and control over such records." The indictment was joint and several. The argument is, first, that appellants did not have custody of the documents and there was no evidence that they had "dominion" or "control" over them, and, second, that custody and not merely dominion or control is essential to require compliance with a subpoena duces tecum. The evidence was that the Committee had subpoenaed the executive secretary and then the chairman of the organization of which appellants were the governing body, that they had refused to produce the records, and that the Committee had then issued the subpoenas to the other members of the executive board. There was sufficient evidence to go to the jury under the instruction. On the point of law, no case involving an unincorporated association is cited to us in the briefs, but it seems to us that the doctrine laid down in Wilson v. United States,[42] in respect to a subpoena addressed to a corporation, must govern. There the Supreme Court said: "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."

We do not have the question whether a subpoena addressed merely to an unincorporated association as such would be valid, and we express no opinion upon that. But we think that subpoenas addressed to all the members of the governing body of such an association are valid under the Wilson case ruling.

Appellants next contend that they were not "willfully" in default, because no specific criminal intent was shown; but we passed adversely upon that contention in Fields v. United States.[43]

---

[40] United States v. Josephson, supra.

[41] 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

[42] 1911, 221 U.S. 361, 374, 376, 31 S. Ct. 538, 543, 55 L.Ed. 771, 777, Ann. Cas.1912D, 558.

[43] Supra note 6.

The next point is whether the trial court erred in admitting in evidence a transcript of the proceedings of the Congressional Committee when appellants were before that Committee and refused to produce the subpoenaed records. Appellants' point is based upon Section 634 of Title 28 of the United States Code Annotated,[44] which provides that no testimony given by a witness before a committee of the House shall be used as evidence in any criminal proceeding against him in any court except in a prosecution for perjury committed in giving such testimony. The trial judge rendered a careful and exhaustive opinion in passing upon the admissibility of this evidence. We agree with his reasoning and conclusion. In sum, we think it must be that accurate and authoritative evidence of what transpired which constituted an alleged contempt, must be admissible when one is charged with that contempt.

Appellants raise several further points directed to rulings and events during the trial. They urge error because the court failed to direct a mistrial when in his closing argument the prosecuting attorney told the jury that they were "not expected to close your eyes to what goes on in the courtroom" in passing upon the reputation which appellants had put in issue. Counsel for appellants objected because, he said at that time, the prosecutor had commented on appellants' failure "to stand". The prosecutor made no such comment, and in view of the defense testimony as to reputation for frankness and forthrightness, admitted over objection of the prosecutor, the latter was entitled to discuss it in addressing the jury. Appellants say that the court erred in failing to include in its charge to the jury "detailed instructions from the court as to each item of evidence" so as to separate the evidence on the conspiracy count. No such instructions were asked at the time, so far as the record shows. Appellants say that "The Trial Court Made Various Other Reversible Errors." They say, for example, that error was committed in rulings upon pertinency and state that the Congressional Commit-

tee, according to its Chairman, acted "solely on the basis of certain anonymous 'postcards' ". We have read the record as cited, but find no such testimony. They say that the testimony of Miss Mitchell was taken by the Committee "after the investigation began". That is true, reading "investigation" to mean the whole course of inquiry, but it was taken before these subpoenas were issued, being given on January 23-24, 1946, and the subpoenas being issued in April, 1946, except that directed to Dr. Barsky, which was issued January 25, 1946, and served January 28, 1946. Appellants urge error in an instruction that "if one person aids or abets, advises, or counsels, or encourages another to commit an offense, he is equally liable under the criminal law with the one who physically commits it." The instruction was in accordance with the Criminal Code,[45] and we find no error in it. Counsel cannot claim surprise, in that the court correctly instructed the jury on the law of appellants' guilt as a principal under a joint indictment. The cases cited by appellants do not support their contention.

It follows that the judgments of the District Court must be, and they are

Affirmed.

EDGERTON, Associate Justice (dissenting).

In my opinion the House Committee's investigation abridges freedom of speech and inflicts punishment without trial; and the statute the appellants are convicted of violating provides no ascertainable standard of guilt. It follows that the convictions should be reversed on constitutional grounds.

I.

The First Amendment forbids Congress to make any law "abridging the freedom of speech, or of the press." If this "is to mean anything, it must restrict powers which are * * * granted by the Constitution to Congress." [1] Legislation abridging the freedoms guaranteed by the First Amendment is not made valid by the

---

[44] Rev.Stat. § 859.

[45] Criminal Code § 332, 35 Stat. 1152 (1909), 18 U.S.C.A. § 550.

[1] Chafee, Free Speech in the United States, 30–31.

fact that it would be valid if it did not abridge them.

The Murdock, Opelika, and Busey cases make this plain. Clear and necessary as the taxing power is, it does not extend to sales of propaganda not made for profit; a license tax, although imposed for the legitimate purpose of raising revenue, is unconstitutional in its application to such sales.[2] And this is true even if "it has not been proved that the burden of the tax is a substantial clog" on the circulation of propaganda;[3] "it may not be said that proof is lacking that these license taxes * * * are likely to restrict petitioners' * * * activities. On their face they are a restriction of the free exercise of those freedoms which are protected by the First Amendment. * * * A community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful. If that device were ever sanctioned, there would have been forged a ready instrument for the suppression of the faith which any minority cherishes but which does not happen to be in favor. That would be a complete repudiation of the philosophy of the Bill of Rights."[4]

The Murdock and Opelika cases dealt with municipal legislation. The First Amendment applied only indirectly, by way of the due process clause of the Fourteenth Amendment. Here, as in the Busey case,[5] it applies directly.

It was not the weakness of the taxing power but the strength of the First Amendment that made the Murdock and Opelika taxes unconstitutional.[6] Yet this court now holds that the First Amendment, which restricts the express power of taxation, does not restrict the implied power of investigation. Investigation in general, and this investigation in particular, is not more necessary than taxation. There is no basis in authority, policy, or logic for holding that it is entitled to a preferred constitutional position. "Freedoms of speech, press, and religion are entitled to a preferred constitutional position."[7] The power of investigation, like the power of taxation, stops short of restricting the freedoms protected by the First Amendment.

Quite as clearly as the taxes in the Murdock, Opelika, and Busey cases, the House Committee's investigation is on its "face * * * a restriction of the free exercise of those freedoms." It actually

---

[2] Jones v. City of Opelika, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 875, 87 L. Ed. 1292, 146 A.L.R. 81; Busey v. District of Columbia, infra, note 5.

[3] Jones v. City of Opelika, 316 U.S. 584, 604, 62 S.Ct. 1231, 1242, 86 L.Ed. 1691, 141 A.L.R. 514. The dissent of Chief Justice Stone, here quoted, and the other dissents filed at the same time, were afterwards adopted as opinions of the Court. Jones v. City of Opelika, 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290.

[4] Murdock v. Commonwealth of Pennsylvania, supra, note 2, 319 U.S. at pages 114, 116, 63 S.Ct. at pages 875, 876.

[5] The Supreme Court's mandate in Busey v. District of Columbia, 319 U.S. 579, 63 S.Ct. 1277, 87 L.Ed. 1598, required us to apply the principle of Murdock and Opelika to a tax imposed by Act of Congress. Busey v. District of Columbia, 78 U.S.App.D.C. 189, 138 F.2d 592.

[6] The First Amendment similarly restricts legislative power to regulate e. g. public education, West Virginia State

Board of Education v. Barnette, 319 U. S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; People of State of Illinois ex rel. McCollum v. Board of Education, 68 S.Ct. 461; labor unions, Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; use of streets, Schneider v. State of New Jersey (Town of Irvington), 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155.

[7] Busey v. District of Columbia, 78 U. S.App.D.C. 189, 192, 138 F.2d 592, 595. We based our ruling on Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288; Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; and United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L. Ed. 1234. Cf. Schneider v. State of New Jersey (Town of Irvington), 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Thornhill v. State of Alabama, 310 U.S. 88, 95-96, 60 S.Ct. 736, 84 L.Ed. 1093; Thomas v. Collins, 323 U.S. 516, 529-530, 65 S.Ct. 315, 89 L.Ed. 430.

restricts them and puts a substantial clog upon them. It is therefore more clearly unconstitutional than the taxes.

The investigation restricts the freedom of speech by uncovering and stigmatizing expressions of unpopular views. The Committee gives wide publicity to its proceedings. This exposes the men and women whose views are advertised to risks of insult, ostracism, and lasting loss of employment.[8] Persons disposed to express unpopular views privately or to a selected group are often not disposed to risk the consequences to themselves and their families that publication may entail.[9] The Committee's practice of advertising and stigmatizing unpopular views [10] is therefore a strong deterrent to any expression, however private, of such views.

The investigation also restricts freedom of speech by forcing people to express views. Freedom of speech is freedom in respect to speech and includes freedom not to speak. "To force an American citizen publicly to profess any statement of belief" is to violate the First Amendment. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." That is the rule of the Barnette case,[11] which involved pressure on school children to profess approved beliefs. Witnesses before the House Committee are under pressure to profess approved beliefs. They cannot express others without exposing themselves to disastrous consequences. Yet if they have previously expressed others they cannot creditably or credibly profess those that are approved. If they decline "publicly to profess any statement of belief" they invite punishment for contempt. The privilege of choosing between speech that means ostracism and speech that means perjury is not freedom of speech.

"Under our traditions beliefs are personal and not a matter of mere association." [12] Yet the House Committee attributes unpopular and "communistic" beliefs to persons and groups on the basis of mere association with other persons and groups.[13] By this device it greatly extends the restraining effect of its investigation. Its

---

[8] "Hollywood Fires 10 Cited in Contempt. Film Heads Rule They Must Swear They're Not Reds To Be Rehired". Head and subhead in Washington Post, Nov. 26, 1947, p. 1, col. 4.

[9] "Patently, if it is well known that expressing novel political ideas and advocating certain types of change in government frequently subject individuals to burdensome investigation and disparaging publicity, many persons might be constrained to refrain from such activity." Note, Constitutional Limitations on the Un-American Activities Committee, 47 Col.L.Rev. 416, 428.

[10] The President's Committee on Civil Rights has proposed "legislation requiring all groups, which attempt to influence public opinion, to disclose the pertinent facts about themselves through systematic registration procedures." To Secure These Rights, p. 164. Sound or unsound, this proposal raises different questions from those before us. The proposed "registration procedures" would be confined to fact, without inference or epithet; would have no punitive purpose; would apply to all groups that attempt to influence public opinion, not to groups selected in order to be stigmatized; and would not apply to groups that do not attempt to influence public opinion.

[11] West Virginia State Board of Education v. Barnette, 319 U.S. 624, 634, 642, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674.

"It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." 319 U.S. page 633, 63 S. Ct. page 1183.

[12] Schneiderman v. United States, 320 U.S. 118, 136, 63 S.Ct. 1333, 1342, 87 L.Ed. 1796.

[13] Robert E. Cushman, Goldwin Smith Professor of Government in Cornell University, has said: "Under the guise of attacking Communism [Mr. Dies] was able to attack all so-called liberal ideas in the field of politics and economics. This was done by pinning the label of Communism on all persons who belonged to any society or organization in which there ever had been any Communist member, or any idea, theory, or action of which any Communist had ever approved." Civil Liberty and Public Opinion; in Safeguarding Civil Liberty Today, Bernays lectures of 1944 at Cornell University, 81, 100.

treatment of the Southern Conference for Human Welfare [14] illustrates its practice.[15] It further extends the restraining effect of its investigation by stigmatizing a remarkably wide range of beliefs as un-American.[16]

That the Committee's investigation does in fact restrict speech [17] is too clear for dispute. The prosecution does not deny it and the court concedes it. The effect is not limited to the people whom the Committee stigmatizes or calls before it, but extends to others who hold similar views and to still others who might be disposed to adopt them. It is not prudent to hold views or to join groups that the Committee has condemned. People have grown wary of expressing any unorthodox opinions. No one can measure the inroad the Committee has made in the American sense of freedom to speak. There has been some suggestion that it restrains only timid people. I think it nearer the truth to say that, among the more articulate, it affects in one degree or another all but the very courageous, the very orthodox, and the very secure.[18] But nothing turns on this question of fact. The views of timid people are not necessarily worthless to society. No one needs self-expression more. The Constitution protects them as it protects others. If it be true that the Committee's investigation would not restrain a determined man, this matters no more than the fact that the taxes in the Murdock and Opelika cases would not restrain a rich man. Some people speak freely whatever it costs, but this does not mean that speech is free whatever it costs.

This court is ruling that although restraint results from the Committee's investigation it is not forbidden by the Constitution. But the mere fact that restraint is *likely* to result from the investigation is more than enough to bring it within the condemnation of the Murdock and Opelika cases.

The case is stronger than Murdock and Opelika not only because the investigation actually and greatly restrains speech but in other respects as well. In the Murdock and Opelika cases there was no purpose to restrain and no singling out of propaganda for special treatment. License taxes on sales, imposed in general terms and for the legitimate purpose of raising revenue, were unconstitutional in failing to exempt sales of propaganda not made for profit. The mere incidental inclusion of propaganda among activities burdened only incidentally to a proper legislative purpose was bad. But in the present case neither the inclusion nor the burdening of propaganda is incidental. The House Committee's enabling Act concerns, specifically and exclusively, "propaganda activities," and the Committee's principal purpose is to restrain them.

---

[14] One suspicious circumstance, in the Committee's view, was that an entertainer at one meeting of the Conference was employed by a New York night club whose owner's brother was a Communist. H. Rep. No. 592, 80th Cong., 1st Sess., 10 (1947). Professor Gellhorn of Columbia University has made a thorough study of this Report. Gellhorn, Report on a Report of the House Committee on Un-American Activities, 60 Harv.L. Rev. 1193.

[15] Cf. a subcommittee's action on Dr. Condon, Director of the National Bureau of Standards; reported in Washington Post, (Washington) Evening Star, March 5, 1948.

[16] Infra at note 26. Professor Cushman says: "The opprobrious epithet 'un-American' was applied to all those who indulged in any open criticism of our existing institutions, our so-called American way of life, or of Mr. Dies. * * * Good loyal American citizens who ought to know better were persuaded to give their support to the suppression of free speech and free press on the grotesque theory that they were thereby showing their loyalty to the basic principles of American democracy. Bigotry was made not merely respectable but noble. By the skillful use of labels, or slogans, American public opinion was inoculated with the dangerous idea that true Americanism consists in the stalwart defense of the *status quo* and the suppression of those dangerous and disloyal people who are unpatriotic enough to want to criticize it or suggest any change in it." Op. cit. supra note 13, at 100.

[17] Its effect on people in the moving picture industry has been described in the newspapers and in a report in the New Yorker of Feb. 21, 1948, p. 32.

[18] Even in 1943, after less than five years of existence, the Committee had accumulated a file of over 1,000,000 cards containing information on individuals and organizations. H. Rep. No. 2748, 77th Cong., 2d Sess., 2 (1943).

Its purpose is shown clearly by its acts and conclusively by its statements. The Committee and its members have repeatedly said in terms or in effect that its main purpose is to do by exposure and publicity what it believes may not validly be done by legislation. [19] This is as much as to say that its purpose is to punish or burden propaganda.[20] The Committee has "embarked upon a systematic campaign to suppress freedom of political and economic opinion." [21]

What Congress may not restrain, Congress may not restrain by exposure and obloquy. If it be thought that the Committee's purpose does not include "punishment, in the ordinary sense," this is immaterial to the present point.[22] The First Amendment forbids Congress purposely to burden forms of expression that it may not punish.[23]

It is said that Congress may punish propaganda that advocates overthrow of the government by force or violence; that it may therefore investigate to determine whether such legislation is necessary; and

[19] When the House of Representatives first authorized the Committee as a special committee Mr. Dies, its first chairman, said "I am not in a position to say whether we can legislate effectively in reference to this matter, but I do know that exposure in a democracy of subversive activities is the most effective weapon we have in our possession." 83 Cong. Rec. 7570 (1938). Some years later Mr. Mundt said: "The country might as well be told first as last that our committee is in this fight to expose un-American activities to the finish. By your votes today we ask you to give evidence of your support." 92 Cong.Rec. 3767 (1946). Mr. Rankin has said, in the present record, that the Committee is a "grand jury" to which "defense counsel" should not be admitted. See also 91 Cong.Rec. 275 (1945).

The Committee's Reports declare its purpose. "While Congress does not have the power to deny to citizens the right to believe in, teach, or advocate communism, fascism, and nazism, it does have the right to focus the spotlight of publicity upon their activities." H. Rep. No. 2, 76th Cong., 1st Sess., 13 (1939). " * * * Investigation to inform the American people * * * is the real purpose of the House Committee. * * * The committee conceives its principal task to have been the revelation of the attempts now being made by extreme groups in this country to deceive the great mass of earnest and devoted American citizens. * * * The purpose of this committee is the task of protecting our constitutional democracy by * * * pitiless publicity. * * * " H. Rep. No. 1476, 76th Cong., 3d Sess., 1, 3, 24 (1940). "This committee is the only agency of Government that has the power of exposure. * * * There are many phases of un-American activities that cannot be reached by legislation or administrative action." H. Rep. No. 1, 77th Cong., 1st Sess., 24 (1941). The

Committee is "empowered to explore and expose activities by un-American individuals and organizations which, while sometimes being legal, are nonetheless inimical to our American concepts and our American future." H. Rep. No. 2742; 79th Cong., 2d Sess., 16 (1947). The Committee regards discovery and exposure as its "special function" by mandate from the House. H. Rep. No. 2748, 77th Cong., 2d Sess., 2 (1943). Accordingly it made public the names, positions, and salaries of some 563 government employees as members of the American League for Peace and Democracy. "The committee felt that the Congress and the people were entitled to know who they were." Ibid, pp. 4-5.

Chairman Thomas recently said in a radio address: "The chief function of the committee, however, has always been the exposure of un-American activities. This is based upon the conviction that the American public will not tolerate efforts to subvert or destroy the American system of government, once such efforts have been pointed out. The Congress' right to investigate and expose undemocratic forces is as established and untrammeled as our Constitution." Cong. Rec., 80th Cong., 1st Sess., A4606 (Nov. 20, 1947).

[20] Some of the phrases quoted in the preceding footnote, e. g., "effective weapon," "grand jury," "protecting our constitutional democracy by * * * pitiless publicity," "the American public will not tolerate," express this purpose even more directly.

[21] Cushman, op. cit. supra note 13, at 100.

[22] Near v. State of Minnesota, 283 U.S. 697, 711, 51 S.Ct. 625, 629, 75 L.Ed. 1357.

[23] A purpose to reduce the circulation of newspapers makes a tax law unconstitutional. Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660.

that it may do this even if the investigation burdens such propaganda and is intended to do so. In short, it is said that the House Committee's investigation is a necessary means to a constitutional end and is therefore constitutional. To this there are at least three answers.

(1) Investigation of possible need for legislation making it unlawful to advocate overthrow of the government by force or violence has not been necessary and has not been among the purposes of Congress or of the House Committee at any time since 1940. On the contrary, the broadest possible legislation of that sort was passed in that year and is still on the books.[24]

(2) The Committee's enabling Act [25] says nothing about force or violence or overthrow of the government. It is broad enough to include investigation of propaganda advocating such things, but it is not by any means limited to such propaganda, and neither is the Committee's actual investigation. Though the Committee has concerned itself largely with communism, and formerly with fascism, it has also concerned itself with propaganda unrelated to any possible overthrow of the government by force and plainly beyond any power of Congress to burden or restrain. "In the course of its inquiries such diverse groups have come under its scrutiny as the American Civil Liberties Union, the C.I.O., the National Catholic Welfare Conference, * * * the Farmer-Labor party, sit-down strikes, the Federal Theatre Project, consumers' organizations, * * * the magazine Time." Among various "other criteria which the Committee or its agents have from time to time suggested as indicative of activity within the scope of its inquiries are: opposition to 'the American system of checks and balances,' opposition to the protection of property rights, belief in dictatorship, opposition to the Franco government of Spain, opposition to General MacArthur, advocacy of a world state, advocacy of the dissolution of the British Empire, criticism of members of Congress, and criticism of the Committee on Un-American Activities." [26] Obviously there could be no necessity for many of the Committee's activities, and no excuse for the restraints they impose, even if the Act of 1940 were not on the books.

Legislative action that restrains constitu-

---

[24] The so-called Alien Registration Act of 1940 contains provisions having nothing to do with registration and not limited to aliens, but applicable to all persons, that make it "unlawful for any person— (1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government; (2) with the intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence; (3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purpose thereof." 54 Stat. 671, § 2(a), 18 U.S.C.A. § 10.

[25] Quoted infra at note 46.

[26] Supra note 9, at 418, 422–423. The quoted statements are supported by specific references.

The Committee has also scrutinized, e. g., radio commentators who have changed their names or who "can hardly speak English," and Army orientation material which "sought to teach that any person who claimed to be any one or all of the following was a Fascist, or was likely to become a Fascist very shortly: '100 percent American, anti-Jew, anti-Negro, anti-labor, anti-foreign-born, anti-Catholic.'" H. Rep. No. 2233, 79th Cong., 2d Sess., 9-13, 14 (1946).

The Committee said in its first Report: "* * * (5) Any organization or individual who believes in or advocates a system of political, economic, or social regimentation based upon a planned economy is un-American. (6) Any organization or individual who believes in or advocates the destruction of the American system of checks and balances with its three independent coordinate branches of government is un-American." H. Rep. No. 2, 76th Cong., 1st Sess., 12 (1939).

tionally protected speech along with other speech cannot be enforced against either. Legislation is unconstitutional as a whole if it "does not aim specifically at evils within the allowable area of state control but * * * sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute * * * results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. * * * An accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. * * * Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." [27]

Even if the views the House Committee sought to elicit from these appellants had been of a sort that Congress might properly restrain, by investigative or other action aimed specifically at such views, the appealed convictions would have to be reversed. "The statute, as construed and applied, amounts merely to a dragnet which may enmesh anyone who agitates for a change of government * * *." [28]

(3) The problem is not, as the court suggests, that of balancing public or social interests against private interests. "The principle on which speech is classified as lawful or unlawful involves the balancing against each other of two very important social interests, in public safety and in the search for truth. * * * Imprisonment of 'half-baked' agitators for 'foolish talk' may often discourage wise men from publishing valuable criticism of governmental policies. * * * The great interest in free speech should be sacrificed only when the interest in public safety is really imperiled. * * * The American policy is to meet force by force, and talk by talk." [29]

This policy is embodied in American constitutional law. "The penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government." [30] "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent"; [31] "danger of action of a kind the State is empowered to prevent and punish." [32]

There is no evidence in the record that propaganda has created danger, clear and present or obscure and remote, that the government of the United States or any government in the United States will be overthrown by force or violence. "When legislation appears on its face to affect the use of speech, press, or religion, and when its validity depends upon the existence of facts which are not proved, their existence

[27] Thornhill v. State of Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093. Cf. Yu Cong Eng v. Trinidad, 271 U.S. 500, 523, 46 S.Ct. 619, 70 L.Ed. 1059.

[28] Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 742, 81 L.Ed. 1066. The Court continued: "if a jury can be persuaded that he ought to have foreseen his words would have some effect in the future conduct of others." The present statute contains no such qualification, either on its face or as construed and applied.

[29] Chafee, op. cit. supra note 1, at 35 ix, 180.

[30] Herndon v. Lowry, supra note 28,

310 U.S. at page 258, 57 S.Ct. at page 739.

[31] Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470.

[32] West Virginia State Board of Education v. Barnette, supra note 11, 319 U.S. at page 633, 63 S.Ct. at page 1183, 87 L.Ed. 1628, 147 A.L.R. 674. "What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." Bridges v. State of California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192, 159 A.L. R. 1346.

should not be presumed * * *." [33] "The usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." [34]

The court asks "How, except upon inquiry, would the Congress know whether the danger is clear and present?" The context shows that this means "How, except upon *congressional* inquiry * * *?" The answer is: through the Department of Justice, whose duty it is, if clear and present danger can be discovered, to enforce the law of 1940 which makes it a crime to advocate overthrow of the government by force;[35] through the intelligence services; and through any new agency that Congress may think it useful to create. As the House Committee's history shows, no dangerous propaganda that eludes other agencies is likely to be discovered by a congressional inquiry. But a congressional inquiry, however superfluous, to discover whether there is clear and present danger, could be authorized and could be conducted without violating the First Amendment. The premise that the government must have power to protect itself by discovering whether it is in clear and present danger of overthrow by violence is sound. But it does not support the conclusion that Congress may compel men to disclose their personal opinions, to a committee and also to the world, on topics ranging from communism, however remotely and peaceably achieved, to the "American system of checks and balances," the British Empire, and the Franco government of Spain. Since the premise does not support this conclusion it has nothing to do with this case. It justifies no punitive exposure. It justifies a very different investigation from the one the House Committee conducts. The investigation the Committee conducts is unsupported by any

color of necessity. As the fact that some taxation is necessary does not validate everything done in the name of taxation, the fact that some investigation is necessary does not validate everything done in the name of investigation. So far from being necessary to the safety of the government, the Committee's investigation weakens the government by effectively warning the unorthodox, some of whom are conspicuous for ability and patriotism, to avoid government service.

---

The free speech point comes to this. Congressional action that is either intended or likely to restrict expression of opinion that Congress may not prohibit violates the First Amendment. Congressional action in the nature of investigation is no exception. Civil liberties may not be abridged in order to determine whether they should be abridged. The House Committee's investigation is both intended and likely to restrict expression of opinion that Congress may not prohibit. That it actually does so is clear and undisputed. If all this were otherwise the investigation might perhaps be within legislative power.[36] But that is immaterial, like the fact that a tax restricting non-profit sales of propaganda, or intended to restrict circulation of newspapers, would be within legislative power if it had no such effect or purpose.

Congress has ratified the Committee's course by renewing its appropriations and extending its life. However, the question is whether the Committee's investigation is constitutional, not whether it is authorized as between the Committee and Congress. Since Congress could not authorize it, whether or when Congress intended to do so is immaterial. "In passing upon constitutional questions * * * the statute must be tested by its operation and effect." [37] The case is as if the enabling Act read

---

[33] Busey v. District of Columbia, supra note 7, 78 U.S.App.D.C. at page 192, 138 F.2d 595.

[34] Thomas v. Collins, 323 U.S. 516, 529–530, 65 S.Ct. 315, 322, 89 L.Ed. 430. Cf. other cases cited in note 7 supra.

[35] Quoted above, note 24.

[36] But investigation must be related to a matter with which Congress has

power to deal directly and exposure is not a legislative power. Kilbourn v. Thompson, 103 U.S. 168, 190, 26 L.Ed. 377; McGrain v. Daugherty, 273 U.S. 135, 173–174, 47 S. Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1.

[37] Near v. State of Minnesota, supra note 22, 283 U.S. at page 708, 51 S.Ct. at page 628, 75 L.Ed. 1357.

"The Committee shall expose unorthodox propaganda in order to restrain and punish it." The issue is whether Americans may be fined and imprisoned for passive resistance to this inquest into their political and economic views. No one denies that the inquest is an effective instrument of restraint. I hope the last word has not been said on the question whether it is a legal one.

### II.

"An act of Congress which proposed to adjudge a man guilty of a crime and inflict the punishment, would be conceded by all thinking men to be unauthorized by anything in the Constitution." [38] "Legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." [39] A punitive statute is no better if it creates the offense, or authorizes a committee to create it; delegates to the committee the ascertainment of individuals to be punished and the infliction of punishment; provides no standard of guilt; compels the individual, in the committee's discretion, to testify against himself; deprives him of the right to testify in his own defense; and deprives him also of the right to counsel, the right to call witnesses, and the right to cross-examine opposing witnesses. The House Committee's enabling Act, as the Committee has construed and applied it, does all that.

Punishment is harm intentionally inflicted because of conduct. Intentionally inflicted loss of employment is punishment, as the Court held in the Lovett case.[40] Sometimes, as in that case, the Committee intentionally inflicts dismissal from employment. It intentionally and directly inflicts publicity and opprobrium. That these may be damaging is both obvious and recognized by law, including the law of libel. Publicity and opprobrium that are intended as an "effective weapon" against activities that cannot be reached by legislation [41] are intended to inflict damage. They are damaging in fact as well as intention. The Court implied in the Lovett case that no "congressional action, aimed at * * * named individuals, which stigmatized their reputation and seriously impaired their chance to earn a living" can be sustained. The Committee takes such action. Even courts, to which the Constitution entrusted the function of punishment, "were commanded to stay their hands until and unless certain tested safeguards were observed. An accused in court must be tried by an impartial jury, has a right to be represented by counsel, he must be clearly informed of the charge against him, the law which he is charged with violating must have been passed before he committed the act charged, he must be confronted by the witnesses against him, he must not be compelled to incriminate himself * * *." [42] The Committee inflicts punishment for unorthodox opinions or associations without any of these safeguards. To say that it may do so because it is not a court is to say that many vital constitutional rights may be denied because another and a most vital one is also denied.

### III.

"Statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt. * * * Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." On these grounds the Supreme Court, in the recent Musser case, vacated a conviction under a Utah statute punishing conspiracy "to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws * * *." Unlimited by its context or by judicial construction, the Court found this statute so indefinite as to cover "agreement to do al-

---

[38] Kilbourn v. Thompson, supra note 36, 103 U.S. at page 182, 26 L.Ed. 377.

[39] United States v. Lovett, 328 U.S. 303, 315–316, 66 S.Ct. 1073, 1079, 90 L. Ed. 1252.

[40] Id.

[41] Supra, note 19.

[42] United States v. Lovett, supra note 39, 328 U.S. at pages 314, 317, 66 S.Ct. 1078, 1080.

most any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order." Since such notions are highly various, the statute is too vague to support a criminal conviction.[43]

It would be hard to find a clearer instance of this principle than the one before us. The Act under which appellants were convicted makes it a misdemeanor to fail to produce papers "upon any matter under inquiry" before a congressional committee or refuse to answer any question "pertinent to the question under inquiry." [44] "A witness rightfully may refuse to answer where * * * the questions are not pertinent to the matter under inquiry." [45] The matter under inquiry before the House Committee is thus described in its enabling Act and in earlier resolutions: "(i) the extent, character, and objects of *un-American propaganda* activities in the United States, (ii) the diffusion within the United States of *subversive* and *un-American propaganda* that is instigated from foreign countries or of a domestic origin and *attacks* the *principle of the form of government as guaranteed by our Constitution,* and (iii) all other *questions in relation thereto* that would aid Congress in any necessary remedial legislation." [46] Under each of these three clauses, the matter under inquiry is limited by the term "un-American." If that term is so indefinite as to cover "almost any act which a judge and jury [or the Committee] might find at the moment contrary to his or its notions of what was good * * *" the Musser case requires reversal of the present convictions. For then the matter under inquiry is similarly indefinite; a witness before the committee cannot know whether a question or demand is "pertinent to the matter under inquiry"; and he cannot know whether or not he will be committing a crime if he fails to respond.[47]

The term un-American is completely indefinite. Government counsel do not attempt to define it and concede that they cannot define it. In effect, though not in purpose, they thereby confess error.

In a literal sense whatever occurs in America is American. The President's Advisory Committee on Universal Training, in response to the contention that universal military training was un-American, said "An epithet is not an argument. 'Un-American' means simply that it has not been done before in America." [48] But obviously Congress employed a different usage, and meant the term un-American to connote some propaganda that does occur in America. Just as obviously Congress did not mean it to cover all propaganda that occurs here, including e. g. the usual campaign literature of the major parties. The question is, what line did Congress draw? Congress drew none.

Once the literal sense, which Congress plainly did *not* intend, is left behind, the term un-American is one of the vaguest in the language. It may suggest what is not customary or popular here. But different persons have very different ideas of what is not customary or popular. It seems probable that Congress used the term in some undisclosed sense that includes only some unidentified part of this field and is therefore even more indefinite. The House Committee may perhaps be said to have interpreted the term in practice as including, though not always limited to, (1) "communistic" (and,

43 Musser v. State of Utah, 333 U.S. 95, 97, 68 S.Ct. 397, 398.

44 R.S. § 102, 52 Stat. 942, 2 U.S.C.A. § 192.

45 McGrain v. Daugherty, 273 U.S. 135, 176, 47 S.Ct. 319, 329, 71 L.Ed. 580, 50 A.L.R. 1.

46 60 Stat. 828. Italics supplied. Cf. note 3 of the prevailing opinion.

47 In a prosecution under R.S. § 102, pertinence is part of the government's case, but is a question of "law" for the court. Sinclair v. United States, 279 U. S. 263, 296, 298, 49 S.Ct. 268, 73 L.Ed.

692. It does not follow, as the government suggests, that pertinence which cannot be determined by any ascertainable standard will do. On the contrary, in the recent Musser case, quoted above, the Court declared that reasonable standards are necessary not only "to give adequate guidance to those who would be law-abiding" but also "to guide courts in trying those who are accused."

48 A Program for National Security, Report of the President's Advisory Committee on Universal Training (1947) 39.

formerly, "fascistic") ideas, (2) ideas commonly called radical, and (3) ideas commonly called liberal. The Committee's practice has made this usage somewhat familiar. But in a different usage that is at least as familiar the term un-American includes, without being limited to, ideas commonly called undemocratic. And even if it were conceded that Congress intended the suggested interpretation of the Committee's interpretation, the term un-American would still be too vague for criminal purposes because (a) nothing in the enabling Act informs the public that such an interpretation is intended, (b) the words communistic, fascistic, radical, and liberal are themselves too vague for criminal purposes, and (c) the suggested interpretation is not limited to those words.

This does not begin to exhaust the ordinary varieties of usage of the term un-American. Since some connotation of odium is common to most of them, "un-American propaganda" might perhaps be said to mean "odious propaganda." But this again would not do for criminal purposes. Witnesses before the Committee cannot be required to decide whether or not demanded evidence relates to propaganda that is odious, on pain of criminal punishment if they think it does not and a court thinks it does. And the basic question, whether demanded evidence relates to propaganda that is un-American, is vaguer still, since the answer depends not only upon applying but also upon selecting one of the vague and various meanings of un-American.

The enabling Act uses the word "subversive," the word "attacks," and the words "the principle of the form of government as guaranteed by our Constitution," but it uses none of them independently of the word un-American. Moreover, the quoted words themselves have no reasonably clear meaning. Does "the principle of the form of government" here mean the republican or democratic principle only, or does it include e. g. the constitutional duty of courts not to enforce unconstitutional legislation? This court puts a plural where Congress put a singular, and says "the principles

* * * are obvious." To me it is not obvious how much Congress meant by "the principle," or how much the court means by "the principles," or that the two meanings are identical. Both because "the principle" is vague and because "attacks" is vague, I do not know whether propaganda "attacks the principle" if, e. g., it advocates a constitutional amendment replacing the American principle of judicial review by the British principle of legislative supremacy. Neither do I know whether the kind of propaganda with which the House Committee undertook to connect the appellants through their records "attacks the principle." A member of the Communist Party who advocates sweeping constitutional changes may, in the Supreme Court's view, be "attached to the principles of the Constitution" within the meaning of those words in a naturalization act: "As Justice Holmes said, 'Surely it cannot show lack of attachment to the principles of the Constitution that * * * [one] thinks that it can be improved. * * * If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.' "[49] But we do not know that Congress intended the House Committee's enabling Act to be interpreted in accordance with that view. The Committee interprets it differently.

Apparently Congress did not even intend to give the Committee a definite function. "The purpose seems to have been to give the Committee a roving commission to inquire into any propaganda activities which a majority of the Committee thought warranted investigation."[50] At all events the statutory language, like that held bad in the Musser case, covers "almost any act which a judge and jury [or the Committee] might find at the moment contrary to his or its notions of what was good * * *." A court might as well be asked to enforce "a statute which in terms merely penalized and punished all acts detrimental to the public interest * * *. So vague and indeter-

49 Schneiderman v. United States, supra note 12, 320 U.S. 118, 138, 63 S.Ct. 1333, 1343, 87 L.Ed. 1796.

50 Supra note 9, at 422.

minate are the boundaries thus set to the freedom of speech * * * that the law necessarily violates the guarantees of liberty * * *."[51] In so ruling in the Herndon case the Court did not add: "unless the defendant's act seems to the Court clearly on the penalized side of the vague and indeterminate boundaries." I understand this court to hold that the Committee's demand for appellants' records was clearly within the limits, however vague, of the enabling Act, and that appellants are therefore punishable for not producing them. I have tried to show that the court's premise is erroneous. The Musser and Herndon cases show that it does not support the court's conclusion.

### IV.

Appellants appeared and testified before the Committee but did not produce the demanded records. The court says "These appellants were not asked to state their political opinions. They were asked to account for funds." This distinction merely makes any possible pertinence to the Committee's investigation the more remote. The appellants were asked to account for funds in order to reveal their political opinions. Accordingly the court says: "We are considering a specific question only, which is whether this Congressional Committee may inquire whether an individual is or is not a believer in Communism or a member of the Communist Party." That specific question is before us, if at all, as an aspect of the larger question whether courts may punish individuals for not responding to an inquiry by this Committee into their political opinions. My answer to both questions is no. The Committee's specific inquiry abridged appellants' freedom of speech and attempted to inflict punishment without trial. The Committee's entire investigation was unconstitutional both as abridging freedom of speech and as attempting to punish without trial; and there is no duty to respond to inquiries in an unconstitutional proceeding. The statute the appellants are convicted of violating provides no ascertainable standard of guilt.

I do not consider other alleged errors. Legislation restraining speech, which is excepted from the principle that constitutionality is presumed, should for similar reasons be excepted from the related principle that no ruling on constitutionality is made when a case can be decided on other grounds.

---

[51] Herndon v. Lowry, supra note 28, 301 U.S. at pages 263, 264, 57 S.Ct. at pages 741, 742, 81 L.Ed. 1066. Cf. Thornhill v. State of Alabama, supra note 27.