In the Matter of Lee R. Tompkins, Respondent, against Board of Regents of the University of the State of New York, Appellant.

Argued April 7, 1949; decided July 19, 1949.

470

*Nathaniel L. Goldstein, Attorney-General* (*Henry S. Manley* and *Wendell P. Brown* of counsel), for appellant. I. The proofs show " fraud or deceit " within the meaning of paragraph (a) of subdivision 2 of section 6514 of the Education Law. (*Matter of Kasha* v. *Board of Regents of Univ. of State of N. Y.*, 264 App. Div. 925; *Matter of Mester* v. *Board of Regents of Univ. of State of N. Y.*, 259 App. Div. 776; *Matter of Hutschnecker* v. *Board of Regents of Univ. of State of N. Y.*, 269 App. Div. 891; *Matter of Gilbert* [*Cole*], 266 App. Div. 894; *Buhl* v. *University of State of N. Y.*, 268 App. Div. 530; *Matter of Siegal* v. *Board of Regents of Univ. of State of N. Y.*, 270 App. Div. 783; *Matter of O'Neill* v. *Board of Regents of Univ. of State of N. Y.*, 272 App. Div. 1086.)

II. The present charges are not tied to the Harrison Act but to article 22 of the Public Health Law. III. There is no lack of support for the findings of the medical grievance committee to the effect that Dr. Tompkins' prescriptions for Stevens and Succo were excessive by medical standards. (*Ferguson* v. *Hubbell,* 97 N. Y. 507; *People* v. *Tassell,* 272 App. Div. 710; *Matter of Struble* v. *Vacuum Oil Co.,* 210 App. Div. 344, 217 App. Div. 411; *Matter of Summers* v. *Mohawk Valley Roofing Corp.,* 245 App. Div. 412; *Chicago, Burlington & Quincy Ry. Co.* v. *Babcock,* 204 U. S. 585; *People* v. *Mancuso,* 255 N. Y. 463; *People* v. *Grogan,* 260 N. Y. 138; *United States* v. *Behrman,* 258 U. S. 280; *Boyd* v. *United States,* 271 U. S. 104.)

*F. Walter Bliss* and *Albert T. Decker* for respondent. I. The proof fails to show that Dr. Tompkins was guilty of any fraud or deceit in the practice of his profession. (*Matter of Cowles* v. *Board of Regents of Univ. of State of N. Y.,* 266 App. Div. 629, 292 N. Y. 650; *Waggoner* v. *Jageacks,* 241 App. Div. 324; *Finsilver* v. *Still,* 240 App. Div. 87; *Forker* v. *Brown,* 10 Misc. 161, 159 N. Y. 540; *Urtz* v. *New York Central & Hudson Riv. R. R. Co.,* 202 N. Y. 170; *Adams* v. *Clark,* 239 N. Y. 403; *Dung* v. *Parker,* 52 N. Y. 494; *Webb* v. *United States,* 249 U. S. 96; *Linder* v. *United States,* 268 U. S. 5.) II. Dr. Tompkins did not violate article 22 of the Public Health Law of the State of New York. III. It is not morally or inherently wrong for a physician to prescribe narcotics for addicts. IV. " Fraud or deceit " within the meaning of paragraph (a) of subdivision 2 of section 6514 of the Education Law is not the same as " unprofessional conduct." (*Matter of Cherry* v. *Board of Regents of Univ. of State of N. Y.,* 289 N. Y. 148.) V. Dr. Tompkins' prescriptions were not only within the law, but also within the bounds of proper medical practice in each instance and there is no evidence that they exceeded the limits of correct treatment as judged by medical standards. (*Matter of Carrol* v. *Knickerbocker Ice Co.,* 218 N. Y. 435; *McKay* v. *State Board,* 103 Col. 307.)

BROMLEY, J. This appeal presents the question as to whether a doctor who prescribes narcotic drugs for an addict, with the sole purpose of satisfying the addiction and without a legitimate medical end, is thereby guilty of " fraud or deceit in the

practice of medicine " (Education Law, § 6514, subd. 2, par. [a])
and subject to discipline by the Board of Regents.

After a proceeding pursuant to section 6515 of the Education
Law the board had determined that respondent was guilty of
" fraud or deceit " under the statute and ordered the sus-
pension of his license for six months. In reversing that deter-
mination " on the law and facts " the Appellate Division has
posed another question as to the scope of review of the evidence
in proceedings under article 78 of the Civil Practice Act.

Respondent was a general practitioner. During the summer
and fall of 1944, he was treating Harry Stevens, who had
come to him as a patient in July. Stevens then had told the
doctor of suffering for seven years from bronchitis and pulmon-
ary tuberculosis, and that other physicians had prescribed
for him morphine and dilaudid (a similar narcotic). During
the period from July to December, respondent issued to Stevens
forty-six prescriptions at intervals of two to twelve days for a
total of 12.5 grains of dilaudid and 582.5 grains of morphine
sulphate. Upon eleven occasions Stevens received two pre-
scriptions for morphine sulphate on the same day; and on
October 25th he received three. By November, the doctor was
aware that Stevens was a morphine addict, yet continued to
prescribe the drug for him without consideration of that fact.

During August and September, 1944, respondent issued
three prescriptions for morphine sulphate to a man named Zisk
who had come to him claiming to be in severe pain from a
kidney ailment. He refused Zisk further prescriptions after
recognizing that his story was false. Zisk, a known addict,
informed the Federal Bureau of Narcotics that he had pur-
chased prescriptions for narcotics from the doctor. The bureau
undertook an investigation and John Cross, an agent, visited
the village in which respondent practiced to check the pre-
scriptions filed in the local drugstores. On November 6th,
James Succo, an addict who was employed as an informer by
the bureau, was brought to the village and visited the doctor.
He told respondent that he was a merchant seaman whose ship
had been sunk in a North Atlantic convoy; that a wound on his
face had been received in an automobile accident; that he was a
narcotic addict and desired a prescription for morphine. Succo

received a prescription, for which he paid $5, and upon six other occasions he was sold a prescription for 100 quarter grains each. About a week after the last prescription the doctor told Succo that he could have no more. In explaining those prescriptions respondent said that Succo had attributed his addiction to war injuries and that, moved by patriotic sympathy, he had given the prescriptions and had urged Succo to take smaller amounts in each dose.

On December 5th Succo brought to the doctor's office Schlossberg, an agent of the bureau, whom he introduced as a friend who desired morphine. Schlossberg told the doctor his name was " Salsbury " and that he was an addict. After pointing out that his own supply of narcotics was limited and that frequent prescriptions might arouse the Federal authorities, respondent sold Schlossberg a prescription. Schlossberg later obtained two more prescriptions. The doctor did not examine Schlossberg, and explained that Succo's introduction of the man as a fellow seaman led him to assume that the two were similar cases.

Cross visited respondent on November 16th, said that he had become a narcotics addict while working in a carnival and desired some morphine. He testified to the following colloquy between the doctor and himself: " He said, ' What is the matter with you? ' I said, ' Nothing, I am addicted.' He said, ' I will have to treat you for something, kidney colic.' I said, ' There is nothing wrong, I am addicted.' He said, ' If the federal men come around they will pick me up and I can show I treated you for something.' " Cross then received a prescription for 60 quarter grains of morphine sulphate, and another for 100 quarter grains on December 7th.

The doctor, admitting that he believed Cross to be an addict, explained those prescriptions by the fact that the latter appeared to be a gentleman.

On each of the five prescriptions for Schlossberg and Cross the doctor wrote " Diag: Renal Colic," although he had examined neither of these men. In explanation he testified that a druggist had told him a diagnosis was required on prescriptions for narcotics, and that renal colic was the first thing that had occurred to him, perhaps because it indicates extreme pain.

In the disciplinary proceedings here under review respondent was charged with "fraud or deceit in the practice of medicine", an offense for which the Board of Regents may revoke or suspend his license or impose other discipline (Education Law, § 6514, subd. 2). The order of suspension rests upon findings that the prescriptions for Stevens, Succo, Schlossberg and Cross were issued without justifiable medical purpose and with the intent to satisfy their addiction, and were not written "in good faith and in the course of his regular professional practice". The charges relating to the Zisk prescriptions were dismissed.

Insofar as the court below has reversed the determination of the board upon the facts, its action is inconsistent with the well-settled principle that the courts may review such decisions for errors of law alone (*Matter of Friedel* v. *Board of Regents,* 296 N. Y. 347; *Matter of Weinstein* v. *Board of Regents,* 292 N. Y. 682; Education Law, § 6515, subd. 5; Civ. Prac. Act, § 1296, subd. 7). Properly stated, the question before that court was not whether the record would "convince" one of the facts found by the board, as indicated in the opinion, but whether a reasonable man *might* so find. (See *Matter of Stork Restaurant* v. *Boland,* 282 N. Y. 256, 274.)

So considered, we cannot say that the record does not contain substantial evidence in support of the findings adopted by the board. Respondent conceded that he believed all four men to be addicts, and admitted that he never examined Schlossberg or Cross. After learning of Stevens' addiction the doctor "prescribed to get rid of him" and not to relieve the physical effects of his habit. Clearest indication of conscious wrongdoing, and of intent to conceal it, appears from the inscription "renal colic" upon the five prescriptions for Schlossberg and Cross.

Can we say that issuance of prescriptions for narcotics under such circumstances constitutes "fraud or deceit" within the meaning of section 6514? That question has been complicated in this case by two other statutes to which the parties have referred. The first is the Harrison Narcotic Act (U. S. Code, tit. 26, §§ 2550 *et seq.*), which imposes a Federal tax upon certain drugs, including morphine, produced, imported or sold

in the United States. To insure compliance, the statute provides that a, domestic sale or transfer of any such drug is unlawful unless made upon a special order form, or upon the prescription of a physician (U. S. Code, tit. 26, § 2554). It has been held that a physician violates the statute in prescribing narcotics merely to satisfy addiction (*Webb* v. *United States,* 249 U. S. 96), and that no offense is committed by prescribing a moderate amount of drugs to relieve the physical consequences of addiction (*Linder* v. *United States,* 268 U. S. 5).

The second statute is the Uniform Narcotic Drug Act (Public Health Law, §§ 420–448). It provides that a physician may prescribe narcotics only '' in good faith and in the course of his professional practice '' (§ 427). To obtain such drugs through fraud or subterfuge, and to '' make or utter any false or forged prescription '', are violations of the act (§ 438, subds. 1, 5) punishable as misdemeanors (Penal Law, § 1751-a). Under both State and Federal law pharmacists are required to keep prescriptions for narcotics on file for two years, readily available for law enforcement officers (Public Health Law, § 429, subds. 3, 5; U. S. Code, tit. 26, § 2554, subd. [c], par. [2]).

Throughout this proceeding respondent has contended that the charges against him in effect alleged a violation of the Harrison Act. The board has maintained that the charges reflect offenses under sections 427 and 438 of the Public Health Law, insofar as any statute is involved other than section 6514. On this head we agree with the Appellate Division that our consideration must be restricted to the charge of '' fraud or deceit '' under section 6514 and the scope of that provision.

With respect to those terms respondent apparently contends that they import the material elements of the analogous tort concept, whereby liability for fraud is predicated upon willful and conscious misrepresentation which misleads another to his detriment (see *Eaton, Cole & Burnham Co.* v. *Avery,* 83 N. Y. 31). In that sense it is urged that there is no proof of respondent's intent to defraud anyone. The board insists that the terms '' fraud or deceit in the practice of medicine '' are equivalent in meaning to '' unprofessional conduct '', which is a ground for discipline in other professions than medicine (e.g., Judiciary Law, § 90, subd. 2 [attorneys]; Education Law, § 6613 [dentists]).

Both contentions are wide of the mark. The words " fraud or deceit " must be read in light of their traditional meaning in the law (*Matter of Cowles* v. *Board of Regents,* 266 App. Div. 629, 633, affd. 292 N. Y. 650) and cannot be synonymous with " unprofessional conduct "— a term which may signify activity quite unlike fraud in the customary sense. (Cf. *Matter of Bell* v. *Board of Regents,* 295 N. Y. 101.)

The decisions under paragraph (a) of subdivision 2 of section 6514 have not expressly considered the meaning of the terms, but all of the cases disclose behavior which may be characterized as intentional misrepresentation or concealment of fact (e.g., *Matter of O'Neill* v. *Board of Regents,* 272 App. Div. 1086; *Matter of Siegal* v. *Board of Regents,* 270 App. Div. 783; *Matter of Hutschnecker* v. *Board of Regents,* 269 App. Div. 891, affd. 295 N. Y. 558; *Matter of Gilbert* [*Cole*], 266 App. Div. 894). Since the statute is not concerned with private rights, it should not be construed to require that anyone actually has been misled, so long as the intent is present. Thus, in *Matter of Gilbert* (*supra*), a doctor had made a clandestine operation and surreptitiously dismembered a corpse in order to conceal a crime. His offense was complete when those acts had been done for an obvious purpose.

The issuance of a prescription for narcotic drugs to an addict without proper medical basis is clearly an act which is calculated to deceive those whose legitimate concern is the enforcement of the laws controlling trade in and consumption of narcotics. Such a prescription is more than a direction to the pharmacist. It plays an integral part in the system of control and, if not a true prescription, may throw that system awry. It is clear that respondent was conscious of those facts, and therefore we must hold that his conduct constituted " fraud or deceit " under section 6514.

The doctor's hitherto unblemished record, his generous contributions to public service, and his excellent reputation in the community, are persuasively set forth by the court below. Although those factors cannot outweigh the clear indication that he knew the nature of his acts, they should be significant to the board in exercising its broad discretion to frame the appropriate discipline, for the offense and for the offender. While exercise of that discretion is beyond our power to review, those considerations will be open to the board upon remittitur.

The order of the Appellate Division should be reversed, the determination of the Board of Regents annulled, and the matter remitted to the Board of Regents for further proceedings not inconsistent with the opinion herein, with costs in this court and in the Appellate Division to the appellant.

LOUGHRAN, **Ch. J.,** LEWIS, CONWAY, DESMOND, DYE and FULD, JJ., concur.

Order reversed, etc.