In the Matter of EDWARD K. BARSKY, Appellant, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

In the Matter of JACOB AUSLANDER, Appellant, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

In the Matter of LOUIS MILLER, Appellant, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Argued October 23, 1952; decided February 26, 1953.

*Paxton Blair* and *Abraham Fishbein* for appellant in first above-entitled proceeding. I. Respondent lacked jurisdiction because the offense of which appellant had been convicted in the District of Columbia is not defined as a crime in New York. (*People* v. *Welch,* 141 N. Y. 266; *People* v. *Conti,* 127 Misc. 244; *Matter of Lindenfeld* v. *Board of Regents,* 273 App. Div. 1040; *People* v. *Fisher,* 145 Misc. 406, 241 App. Div. 722; *Matter of Donegan,* 282 N. Y. 285; *People ex rel. Marks* v. *Brophy,* 293 N. Y. 469; *People ex rel. Atkins* v. *Jennings,* 248 N. Y. 46; *People* v. *Stovall,* 172 Misc. 469; *People ex rel. Stein* v. *Murphy,* 256 App. Div. 856; *The Antelope,* 10 Wheat. [U. S.] 66; *United States* v. *Lathrop,* 17 Johns. 4; *Sims* v. *Sims,* 75 N. Y. 466; *Matter of Cohen,* 164 Misc. 98, 254 App. Div. 571, 278 N. Y. 584; *Packer Collegiate Inst.* v. *University of State of N. Y.,* 298 N. Y. 184.) II. Even if the Court of Appeals should hold that appellant had been convicted of a crime within the meaning of paragraph (b) of subdivision 2 of section 6514 of the Education Law, nevertheless respondent's determination was arbitrary, capricious and unconscionable. One cannot be punished

twice for the same offense. Respondent has no power to impose additional punishment merely for the sake of additional punishment. (*Sinclair* v. *United States,* 279 U. S. 263; *Matter of Donegan,* 265 App. Div. 774, 294 N. Y. 704; *Matter of Mandel* v. *Board of Regents,* 250 N. Y. 173; *Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271; *Reduction Co.* v. *Sanitary Works,* 199 U. S. 306; *People ex rel. Bennett* v. *Laman,* 277 N. Y. 368.) III. Respondent's determination was predicated upon matter elicited by the Attorney General which has been held to be reversible error as a matter of law. (*Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123; *Matter of People* [*International Workers Order*], 199 Misc. 941.) IV. Respondent committed reversible errors in its exclusion of evidence and in predicating its determination on contrived conjecture. On the one hand, respondent ruled that appellant had so completely demonstrated that the organization was purely a relief organization, that no further evidence of its activities or expenditures would be allowed. On the other hand, respondent based its determination on conjecture, without proof, that there may have been wrongful activities or expenditures. (*Matter of Lynch's Builders Restaurant* v. *O'Connell,* 277 App. Div. 705.) V. The courts have uniformly annulled determinations that were made without direct evidence involving the licensee, or that were predicated upon conjecture. The sole " evidence " adduced consisted of hearsay-upon-hearsay statements and conjecture, to the effect that the organization may have carried on unspecified propaganda. There was an utter absence of direct testimony to this effect, and not the slightest evidence to support this claim, and no attempt was made to link up any such claim with appellants. (*Matter of Friedel* v. *Board of Regents,* 296 N. Y. 347; *Matter of Toyos* v. *Bruckman,* 266 App. Div. 28; *Matter of Konopka* v. *Bruckman,* 290 N. Y. 777; *Matter of Stevensville Lake Holding Corp.* v. *O'Connell,* 269 App. Div. 804.) VI. Respondent failed to discharge the burden of proving that the contempt of which appellant was convicted is a crime even under the Federal law. The contempt for which appellant was convicted is excluded from the " Contempts constituting crimes " listed in section 402 of title 18 of the United States Code. (*Egbert* v. *Chew,* 14 N. J. L. 446; *Matter of Donegan,* 282 N. Y. 285; *Donnelley*

v. *United States,* 276 U. S. 505; *Watts* v. *United States,* 161 F. 2d 511.) VII. Section 6514 and subdivision 2 of section 6515 of the Education Law are unconstitutional on their face and as applied to the facts of this case. (*Packer Collegiate Inst.* v. *University of State of N. Y.,* 298 N. Y. 184; *Matter of Mandel* v. *Board of Regents,* 250 N. Y. 173; *Matter of Small* v. *Moss,* 279 N. Y. 288; *Matter of Seignious* v. *Rice,* 273 N. Y. 44; *Matter of Friedel* v. *Board of Regents,* 296 N. Y. 347; *Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271.)

*Matthew Silverman* for Haven Emerson and others, *amici curiæ,* in support of appellant's position in first above-entitled proceeding. On the facts of this case there exists no valid basis for discipline beyond the statutory minimum of censure and reprimand; the suspension violates the spirit if not the letter of the law allowing such discipline.

*Paxton Blair, Joseph E. Brill, Coleman Gangel* and *Benjamin J. Jacobson* for appellants in second and third above-entitled proceedings. I. The offense of which petitioners have been convicted in the United States District Court of the District of Columbia does not come within the purview of the " crime " contemplated by paragraph (b) of subdivision 2 of section 6514 of the Education Law. (*Matter of Donegan,* 282 N. Y. 285; *People ex rel. Marks* v. *Brophy,* 293 N. Y. 469; *People* v. *Fury,* 279 N. Y. 433; *People ex rel. Goodrich* v. *Martin,* 183 Misc. 790, 268 App. Div. 1077.) II. The crime of which petitioners have been convicted, not involving moral turpitude or their professional qualifications, is not such a crime as is contemplated by paragraph (b) of subdivision 2 as a basis for disciplinary action. (*Liggett Co.* v. *Baldridge,* 278 U. S. 105; *Reduction Co.* v. *Sanitary Works,* 199 U. S. 306; *People* v. *Ford Motor Co.,* 271 App. Div. 141; *Lawton* v. *Steele,* 152 U. S. 133; *People ex rel. Bennett* v. *Laman,* 277 N. Y. 368; *Sinclair* v. *United States,* 279 U. S. 263.)

*Osmond K. Fraenkel* and *Herbert Monte Levy* for New York Civil Liberties Union, *amicus curiæ,* in support of appellants' position in all proceedings. The statute as construed below permits suspension or revocation of a physician's license on grounds not involving moral turpitude and having no relation

whatsoever to a physician's qualifications for the practice of medicine. Such a construction is in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. (*Garner* v. *Los Angeles Bd.*, 341 U. S. 716; *Breard* v. *Alexandria*, 341 U. S. 622; *New State Ice Co.* v. *Liebmann*, 285 U. S. 262; *Liggett Co.* v. *Baldridge*, 278 U. S. 105; *Douglas* v. *Noble*, 261 U. S. 165; *Hawker* v. *New York*, 170 U. S. 189; *Ex parte Wall*, 107 U. S. 265; *Cummings* v. *State of Missouri*, 4 Wall. [U. S.] 277; *Ex parte Garland*, 4 Wall. [U. S.] 333.)

*Nathaniel L. Goldstein, Attorney-General (Henry S. Manley and Wendell P. Brown of counsel)*, for respondent in all proceedings. I. The statutory provision for disciplinary action does not provide either expressly or by implication that the " crime " must impute moral turpitude or involve professional activity or qualifications. (*Matter of Okin*, 272 App. Div. 607; *Matter of Swift* v. *Graves*, 173 Misc. 1085; *Matter of Weinrib* v. *Beier*, 269 App. Div. 481; *Barretta* v. *Barretta*, 182 Misc. 852; *Hofferman* v. *Simmons*, 177 Misc. 962, 290 N. Y. 449; *United States* v. *Francioso*, 164 F. 2d 163; *Matter of Sagos* v. *O'Connell*, 301 N. Y. 212; *Helvering* v. *Mitchell*, 303 U. S. 391; *Ex parte Wall*, 107 U. S. 265; *People* v. *Hawker*, 152 N. Y. 234, *Hawker* v. *New York*, 170 U. S. 189.) II. The Federal offense for which Dr. Barsky was convicted is a " crime " within paragraph (b) of subdivision 2 of section 6514 of the Education Law. (*Matter of Donegan*, 282 N. Y. 285; *People ex rel. Marks* v. *Brophy*, 293 N. Y. 469; *Matter of Donegan*, 265 App. Div. 774, 294 N. Y. 704; *Matter of Greenberger*, 265 App. Div. 343; *Matter of Turley*, 268 App. Div. 706; *Matter of Butcher*, 269 App. Div. 545; *Matter of Hiss*, 276 App. Div. 701; *Matter of Sheinman*, 277 App. Div. 39; *People* v. *Lafaro*, 250 N. Y. 336; *Matter of Platzman* v. *Board of Regents*, 274 App. Div. 952; *Matter of Garsson* v. *Wallin*, 279 App. Div. 1111, 304 N. Y. 702; *Matter of Tonis* v. *Board of Regents*, 295 N. Y. 286; *Matter of Lindenfeld* v. *Board of Regents*, 273 App. Div. 1040.)

DESMOND, J. These are proceedings, brought under article 78 of the Civil Practice Act, to review determinations of respondent Board of Regents, suspending for certain periods the medical licenses of petitioners Barsky and Auslander, and

censuring and reprimanding petitioner Miller. In each instance the board found authority for its action in paragraph (b) of subdivision 2 of section 6514 of the Education Law, which authorizes disciplinary action against a physician who "has been convicted in a court of competent jurisdiction, either within or without this state, of a crime ". The question on this appeal is as to the meaning and application of that statute.

Each of the petitioners-appellants is a physician licensed to practice in this State. All three were members of the executive board of the Joint Anti-Fascist Refugee Committee, a voluntary association which functioned during the Second World War and immediately thereafter (see the brief statement of its history and aims, in *Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123, 130, 131). All three were indicted in the United States District Court for the District of Columbia for, and all were, after a jury trial in that court, convicted of the misdemeanor of contempt of Congress, under section 192 of title 2 of the United States Code, in that each of them failed to obey a subpœna requiring him to produce before a Congressional Committee the financial books and records of the Joint Anti-Fascist Refugee Committee. Each was sentenced to a fine and to imprisonment. The judgments of conviction were affirmed on appeal (*Barsky* v. *United States,* 167 F. 2d 241), certiorari was twice denied by the Supreme Court (334 U. S. 843; 339 U. S. 971), and each petitioner paid his fine and was imprisoned. Then followed the charges with which we deal here.

We consider that, in these records on appeal, there are no controlling facts other than those above summarized, since the voluminous testimony before the Regents as to the character and purposes of the Joint Anti-Fascist Refugee Committee, and as to the motives of these appellants, could not change the admitted fact of their conviction. From the record it is clear that each petitioner has, in fact, " been convicted in a court of competent jurisdiction * * * without this state, of a crime " (Education Law, § 6514, subd. 2, par. [b]). Petitioners, however, make these arguments: first, that the statutory language applies only to such offenses as are crimes under New York law, and that contempt of Congress (U. S. Code, tit. 2, § 192) is not a crime under any statute of this State; second, that the

legislative intent of section 6514 (subd. 2, par. [b]) is to authorize disciplinary action for such offenses only as involve moral turpitude, or are related to professional ability or conduct, and, third, that the Regents imposed unwarranted punishment, and took into account prejudicial matter in fixing the penalties.

There is nothing in section 6514 (subd. 2, par. [b]) which says that, in order to serve as a predicate for action thereunder, the '' crime '' must be one specifically forbidden as such by a New York penal statute. Indeed, a directly opposite idea is expressed in the language: '' convicted in a court of competent jurisdiction, either within or without this state ''. Such language is too plain to permit construction by addition of unexpressed qualifications or exceptions (*Matter of Rathscheck,* 300 N. Y. 346, 350). Petitioners, however, argue that such decisions as *Matter of Donegan* (282 N. Y. 285); *People ex rel. Marks* v. *Brophy* (293 N. Y. 469); *Matter of Tonis* v. *Board of Regents* (295 N. Y. 286), and *Matter of Garsson* v. *Wallin* (304 N. Y. 702) mean that the New York courts construe such statutes as section 6514 (subd. 2, par. [b]) as authorizing penalties for such offenses only as are made criminal, if committed in this State, by our own laws. As to the *Donegan, Marks, Tonis* and *Garsson* cases, each had to do with the imposition of stringent additional penalties on, and solely because of, conviction of a '' felony ''. Donegan, Marks, Tonis and Garsson had each fallen afoul of a foreign statute which made certain conduct a felony which was either a misdemeanor in New York or not cognizable at all under our domestic statutory definitions and classifications of crimes. Indeed, this court, as to Donegan (see 282 N. Y., p. 293), made it clear that it was not denying the Appellate Division's *discretionary* power to deal with him as one guilty of a '' crime '' (Judiciary Law, former § 88, subd. 2, now § 90, subd. 2). In the statute now before us (Education Law, § 6514, subd. 2, par. [b]), the Legislature has authorized disciplinary action against one convicted, not of a '' felony '', but of a '' crime ''. Traditionally as well as by express statute (Penal Law, § 2), the word '' crime '' in New York law includes misdemeanors as well as felonies, and so it is patent that these petitioners have '' been convicted in a court of competent jurisdiction * * * without this state, of a crime ''. As we

remarked in *People ex rel. Marks* v. *Brophy* (*supra,* pp. 474 475), it is the policy of our State not to decree forfeitures in our courts, if we can avoid them, for violations of the criminal laws of another jurisdiction. But public policy is made by the Legislature (see *Matter of Rhinelander,* 290 N. Y. 31, 36) and the policy of this section of the Education Law cannot be misunderstood. It does not require the imposition of any particular penalties, but leaves it to the Regents to decide on the measure of discipline, up to the extreme limit of license revocation.

We do not find it necessary to rely on an additional ground, put forward in the report of the Regents' Committee on Discipline in these proceedings for holding that petitioners' conviction in the District of Columbia was for a " crime ", as that word is used in the Education Law section. The Committee on Discipline noted that New York does have, in section 1330 of the Penal Law, a provision making it a misdemeanor willfully to refuse to produce material and proper documents before a committee of our *State Legislature.* That enactment, the Regents' Committee thought, is so similar in meaning to section 192 of title 2 of the United States Code, that one violating the latter is really committing about the same offense as is made criminal by our section 1330. Be that as it may, we construe section 6514 (subd. 2, par. [b]) of the Education Law as it plainly reads, that is, to authorize discipline by the Regents in the event of a conviction of a physician of a crime in any court of competent jurisdiction. Section 1330 (*supra*) does, however, have this significance at this point: it illustrates, at least, that making a criminal offense out of a refusal to obey a legislative subpœna is in line with New York public policy, as well as that of the Federal Government.

Appellants suggest that a literal construction of section 6514 (subd. 2, par. [b]) will empower the Board of Regents to destroy a person, professionally, solely on a showing of the commission by him in some other State (or country) of an act which we in New York consider noncriminal, or even meritorious. Two answers are available to that: first, some reliance must be placed on the good sense and judgment of our Board of Regents, in handling any such theoretically possible cases; and, second, the

offense here committed, contempt of Congress, is no mere trivial transgression of an arbitrary statute.

Turning to appellants' second main argument, we consider it impossible to read into section 6514 (subd. 2, par. [b]) a condition or qualification that, to justify professional discipline, the crime must be one involving moral turpitude (see, as to there being no moral turpitude in this offense *Sinclair* v. *United States*, 279 U. S. 263, 299), or one related to the profession itself. The Legislature knows how to state such limitations when it so desires (see, for instance, present Education Law, § 7406, subd. 1, as to certified public accountants, and, as to physicians, compare former Public Health Law, § 161, with present Education Law, § 6502). Nor is this an attempt to " enforce the criminal laws of the United States " (*People* v. *Welch,* 141 N. Y. 266, 275). We are enforcing our own statute, of not uncertain meaning, which simply empowers the Regents to impose a penalty upon any physician who has been convicted of a crime in any competent court anywhere. Stringent as it is, that statute needs no cutting down for constitutionality's sake. In is no argument against the validity of this statute that it considers a criminal conviction anywhere as a showing of unfitness, for " it is not open to doubt that the commission of crime, the violation of the penal laws of a State, has some relation to the question of character " (*Hawker* v. *New York,* 170 U. S. 189, 196). A professional license is a high privilege from the State, and the State can attach to its possession conditions onerous and exacting. The special equities of individual cases can be reflected in variety of punishment, as was done here, but the choice among such varieties is for the board, not the courts (*Matter of Sagos* v. *O'Connell,* 301 N. Y. 212).

Somewhat similar to the argument (*supra*) that moral turpitude must be shown, is the contention that the Regents acted arbitrarily in acting on the Federal conviction alone, without regard to the moral right or wrong of what petitioners actually did, that is, refuse to obey legislative subpœnas, and without regard to their motives. Of course, the statute itself was justification for taking the conviction as a professional fault, and the Regents, receiving voluminous testimony as to the nature of

the work of the Joint Anti-Fascist Refugee Committee, and of the character and purposes of these petitioners, are presumed to have taken all those things into account in fixing the penalties.

As to the assertions, by appellants, that the Regents dealt too severely with them, or that the Regents, in deciding on punishment, ignored weighty considerations and acted on matters not proper for consideration, it is enough to say that we are wholly without jurisdiction to review such questions (*People ex rel. Masterson* v. *French,* 110 N. Y. 494, 500; *People ex rel. McAleer* v. *French,* 119 N. Y. 502, 507; *Matter of Greenebaum* v. *Bingham,* 201 N. Y. 343, 347; *People ex rel. Morrissey* v. *Waldo,* 212 N. Y. 174, 179; *People ex rel. Regan* v. *Enright,* 240 N. Y. 194, 198, 199; *Matter of Sagos* v. *O'Connell,* 301 N. Y. 212, 215, *supra*; 1 Benjamin, Report to the Governor on Administrative Adjudication, pp. 170, 217; see *Jaffe* v. *State Dept. of Health,* 135 Conn. 339, 352, 353, 354; *Williams* v. *New York,* 337 U. S. 241, 246 *et seq.*). *Matter of Tompkins* v. *Board of Regents* (299 N. Y. 469) does not announce or apply any different rule as to court review of administrative direction in measuring out discipline against physicians. In the *Tompkins* case, we reversed an Appellate Division order annulling a Regents' determination, because the Appellate Division had exceeded its powers in so doing. Sending the whole matter back to the Regents, because of that error of law, we reminded the board of the physician's fine record, etc., and suggested that such factors should be significant to the board in again " exercising its broad discretion to frame the appropriate discipline, for the offense and for the offender." In that same connection, however, in *Tompkins,* we made it entirely clear that the " exercise of that discretion is beyond our power to review " (p. 476). Had we not there found an error of law (not as to punishment but as to the Appellate Division's unwarranted annulment order) we could not, in the *Tompkins* case, have done other than affirm. In the present case there is no error of law, and so no basis for any interference by us.

The orders should be affirmed.

FULD, J. (dissenting). It is " the public policy of this State that we do not, if we can avoid it, decree forfeitures in our courts because of violations of the criminal laws of another jurisdic-

tion." (*People ex rel. Marks* v. *Brophy,* 293 N. Y. 469, 474.) That public policy is grounded in a natural and humane abhorrence of heaping added domestic penalties upon one convicted of a crime in a foreign jurisdiction. I cannot, therefore, agree with the court's conclusion that the license of a physician may be suspended or revoked by the Regents — pursuant to paragraph (b) of subdivision 2 of section 6514 of the Education Law — because of a conviction of a crime " without this state," when the underlying act is not of a character recognized as criminal by the laws of this state, when it has been held by the courts of the convicting jurisdiction not to involve moral turpitude, and when there is no evidence reflecting adversely on the licensee's qualifications to practice his profession.

Appellant Barsky and a number of others, all members of the Executive Board of the Joint Anti-Fascist Refugee Committee, were convicted, under section 192 of title 2 of the United States Code, of the misdemeanor of contempt of Congress, for failing to produce records of the organization, pursuant to a subpœna of a Congressional Committee conducting an investigation. The conviction was affirmed — one judge dissenting — by the United States Court of Appeals for the District of Columbia (*Barsky* v. *United States,* 167 F. 2d 241); a petition for a writ of certiorari was denied by the United States Supreme Court in June, 1948 (334 U. S. 843) and a petition for rehearing was denied two years later, with a notation that two of the justices were of the opinion that the petition should be granted (339 U. S. 971). Barsky served a term of five months in prison.

The Regents' Committee on Discipline — here comprised of two lawyers and a physician — is the body set up by statute to conduct hearings for the Board of Regents (Education Law, § 211; § 6515, subd. 4; § 6517). It summarized " the issues litigated and not litigated at the criminal trial " in this way: " There was no adjudication with respect to the actual facts regarding the Refugee Committee and its operations. There was no adjudication with respect to the motives or reasons of the defendants in failing to comply with the subpoenas. There was adjudication that the constitutional challenges and the defense of lack of custody or control of the records were legally

insufficient.'' The Committee on Discipline noted further that the federal court had directed judgment of acquittal on a conspiracy count in the indictment.[1]

With regard to the reasons given by Barsky and the other members of the Refugee Committee for withholding records called for by the subpœna, the Regents' Committee on Discipline wrote as follows:

" They had been advised by counsel that the subpoenas were invalid. They asserted that  *  *  *  [none] of their activities fell within the scope of the matters into which  *  *  * the Congressional Committee was authorized to inquire. These facts, they asserted, could be ascertained by examination of the reports which the Refugee Committee had filed with the President's War Relief Control Board. With regard to the scope of the Congressional Committee's authority, they referred further to a statement of the Congressional Committee as to its ' regular duty of collecting information on the operations and activities of fund-raising organizations in this country, whose purpose is in part to conduct activities abroad ', and denied that this was among the subjects committed to the Congressional Committee by the House of Representatives. They expressed a fear that to make public some of the information contained in their records, specifically the names of Spanish Republican exiles who participated in the Refugee Committee's activities or were the beneficiaries of its relief, would endanger the lives of the families of those persons still in Spain. Based in part on a newspaper statement emanating from the Congressional Committee to the effect that its Chief Counsel had on December 1, 1945 [before the subpœnas were issued], asked the President's War Relief Control Board to cancel the Refugee Committee's license, they asserted that the Congressional Committee had evidenced hostility and prejudgment. Finally, they asserted that they were challenging the authority of the Congressional Com-

---

1. It should be noted that, when the parties were before the Committee on Discipline, counsel stipulated that that Committee should consider and take into account matter not in the record of the hearing before the Medical Grievance Committee, including specifically the record of the criminal case in the federal court.

mittee and the validity of its subpoenas so that those questions might if necessary be determined by the courts.

"If these views were honestly held and these assertions honestly made, they would sufficiently explain the refusal by Respondent and the others to produce the subpoenaed records, that being the only method by which the legal objections to the Congressional Committee's course could be judicially determined, and the traditional method by which such legal questions are raised (*Sinclair* v. *United States, supra* [279 U. S. 263]). The question is, then, whether there is any basis in the record for concluding that these views and assertions were not honestly held and made. Our examination of the record discloses no such basis."

And, commenting on the crime of which appellant was later convicted, the Regents' Committee found that "no moral turpitude" was involved.

Those findings are not here questioned; actually, they rest, in large part, on concessions of the Attorney-General at the hearing before the Medical Grievance Committee. Thus, he conceded that appellant was advised by counsel that "the subpoenas were unconstitutionally issued and that he was not legally required to respond to them"; that that opinion at that time was not "an unreasonable construction of law"; and that the same opinion "was held by many lawyers and some jurists" — indeed, by one of the federal court of appeals judges who heard the appeal in the criminal case. In essence, then, the gist of the findings by the Committee on Discipline appears to be this: that the crime of which appellant was convicted did not, as the Supreme Court unequivocally stated, involve moral turpitude (see *Sinclair* v. *United States,* 279 U. S. 263, 299), and that the record was barren of evidence reflecting upon appellant as a man or a citizen, much less upon his professional capacity or his past or anticipated conduct toward his patients.

Against such a background, and in the light of facts such as those set out, it should require language, clear and clean cut, to cause a court to conclude that the legislature has authorized appellant's suspension from practice for six months or, indeed, the revocation of his license.

The court chooses to find such language in that portion of the section of the Education Law which authorizes disciplinary action against a physician who " has been convicted in a court of competent jurisdiction, either within or without this state, of a crime ". It is said, in part, that that " is too plain to permit construction " (opinion, p. 96). I cannot concur. Experience has taught that sheer literalism is more often than not a poor guide to meaning and that a judge must go beyond and outside the dictionary to ascertain the legislative purpose and design. This is especially so here, for reasons which we have discussed at length in analogous cases. (See, e.g., *People ex rel. Marks* v. *Brophy, supra,* 293 N. Y. 469; *Matter of Donegan,* 282 N. Y. 285; see, also, *Matter of Garsson* v. *Wallin,* 304 N. Y. 702.) In *Matter of Donegan (supra,* 282 N. Y. 285, 292), we said that discipline " partakes of the nature of punishment ", with the consequence that statutes imposing discipline " must be strictly construed ", and, in the *Marks* case *(supra,* 293 N. Y. 469, 474), we declared, to " decree forfeitures * * * because of violations of the criminal laws of another jurisdiction ", is contrary to the established " public policy of this State ".

For my own part, I cannot divine in the words of paragraph (b) of subdivision 2 of section 6514 any legislative instruction to apply them literally and remorselessly. On the contrary, I find nothing to indicate that the legislature had any desire to change a policy which has been so often declared and so uniformly adhered to. There is nothing new in the words " convicted * * * without this state "; the *Marks* case *(supra,* 293 N. Y. 469) dealt with virtually identical language and the *Donegan* case *(supra,* 282 N. Y. 285), with language equally broad. In the former case, this court, after noting that the question for decision was the meaning of the language contained in a commutation agreement — *conviction of " a felony, ' either in New York State or any other state ' "* — declared (293 N. Y., at p. 474):

" The *Atkins* case (248 N. Y. 46, *supra*), held that when the Governor of this State in 1914 decreed that a released prisoner should forfeit his commutation if convicted of ' any felony,' the Governor referred only to a conviction of a crime described

in our laws as a felony. We think the Governor who in 1935 ordered that this relator should suffer a similar forfeiture if convicted of ' a felony, either in New York State or any other state ' meant the same thing."

Those cases make it abundantly clear that the mere fact of conviction in another jurisdiction is not enough to warrant the imposition of an additional penalty in this state. It must be a particular kind of conviction.

" Felony," as a term of art, still retains much of its character as an infamous crime and is universally used in American law to distinguish those breaches of the law which are of a more serious character. Despite that, we held that, when the legislators (*Matter of Donegan, supra,* 282 N. Y. 285) or the governor (*People ex rel. Marks* v. *Brophy, supra,* 293 N. Y. 469) used the word " felony," they meant only such acts as would be deemed a felony in New York. *Matter of Donegan* (*supra,* 282 N. Y. 285) is illustrative; we were there required to construe the sections of the Judiciary Law (old § 88, subds. 3, 4, § 477; present § 90, subds. 4, 5), providing for disbarment of an attorney convicted of a felony under the federal law (old § 88, subd. 4; present § 90, subd. 5) as well as under our law. Donegan had been convicted of a conspiracy to commit a mail fraud, a felony under the federal law. It could logically and reasonably be presumed that our legislature, when it required disbarment for conviction of a federal " felony," considered that all crimes classified as felonies by the federal law were of a sufficiently serious character to require such disbarment. Nevertheless, we held that even in that case we would not ascribe such an intention to the legislature, in view of the established policy against forfeiture for violations of the laws of another jurisdiction and in view of the requirement that the statute be strictly construed.

So, here, where the legislature has declared that it must be a conviction of a " crime ", the same rules of policy and construction call upon us to hold that only acts which are criminal under our laws are included. Indeed, if any distinction is to be drawn between the two types of cases — that involving " felony " and the one before us involving " crime " — the argument is far stronger for limiting the term " crime " than

it is for limiting the term " felony ". In enacting the provision under consideration, it is, of course, obvious that the legislature did not canvass all of the myriad " crimes " in the other forty-seven states or under the federal law or under the laws of foreign countries — undoubtedly included in the statute's " without this state," if sheer literalism is the guide — and reach the conclusion that each of those crimes warranted an administrative board in depriving a doctor of his license. Instances may readily be cited of acts denominated crimes — and I cull from the court's opinion (p. 97) — " in some other State (or country)  *  *  *  which we in New York consider noncriminal, or even meritorious." [2]

It seems almost incredible to me that the legislature could have contemplated that such " noncriminal " or " meritorious " acts might be the predicate for a consequence so harsh as revocation or suspension of a physician's right to practice. Yet that is precisely what the court is now holding. It is no answer to say, as the court does — when it is pointed out that such " a literal construction  *  *  *  will empower the Board of Regents to destroy a person " without the slightest warrant — that " some reliance must be placed on the good sense and judgment of our Board of Regents, in handling any such theoretically possible cases " (opinion, p. 97). That may well be so, and it is also true that the Board did not here disbar the licensee or revoke his license, but the fact is, as we wrote in *Packer Collegiate Inst.* v. *University of State of N. Y.* (298 N. Y. 184, 190), a " statute's validity must be judged not by what has been done under it but ' by what is possible under

2. The Regents' Committee on Discipline, for instance, called attention to the fact that, whereas our Domestic Relations Law (§ 5) permits marriage between first cousins, the State of Arkansas stamps it a crime (Ark. Stat. Ann. [1947], §§ 55–103, 41–811, and see *Nations* v. *State*, 64 Ark. 467). I mention but two other instances. In a number of states, it is a violation of so-called segregation laws and a crime for a Negro passenger to refuse to occupy his assigned seat in a segregated section of a public bus. (See, e.g., Ala. Code [1940], tit. 48, § 301 (31a) ; La. Rev. Stat. [1950], tit. 45, § 195; N. C. Gen. Stat. [1950], §§ 62–121.71, 62–121.72, and see *State* v. *Johnson*, 229 N. C. 701; S. C. Code [1952], § 58–1496; Tex. Penal Code, art. 1659; Code of Va. [1950], § 56–329, and see *New* v. *Atlantic Greyhound Corp.*, 186 Va. 726.) And, in Kansas, it is a crime to sell or even to drink alcoholic liquor in a public place. (Kan. Gen. Stat. [1949], §§ 41–719, 41–803, and see *State* v. *Shackle*, 29 Kan. 341.)

it ' ''. And even formal censure, the minimum discipline that the statute prescribes, may itself be extremely damaging to a physician's career. As a matter of statutory construction alone, without considering whether such legislation may be constitutionally enacted, we should not attribute to the legislature a design so palpably harsh and extreme. (See *Matter of Rouss,* 221 N. Y. 81, 91, where the court declared, '' Consequences cannot alter statutes, but may help to fix their meaning.'')

While affirmance herein may affect only appellant, the present decision has an importance that transcends and reaches far beyond this case. And that — its impact over the years — is what so deeply concerns and troubles me. As I have sought to show, the only reasonable construction, and the one recognized by our precedents, is that only those acts, recognized by the laws of this state as criminal in nature, are encompassed by the statute before us. In point of fact, the Regents' Committee on Discipline suggested that the charge against appellant might be sustained upon the ground that the federal crime of which he was convicted finds its analogue in section 1330 of our Penal Law. That section provides that one who, being present before the state legislature or one of its committees, willfully refuses to produce documents '' in his possession or under his control,'' is guilty of a misdemeanor. Whether the act committed by appellant is embraced within that statute presents a highly debatable question, and, since the court has found it unnecessary — in the view that it has taken — to consider the matter, I see little to be gained by discussing it.

However, at least one other question remains for decision.

After noting that the courts would ultimately have to decide whether appellant's crime was one contemplated by the statute, the Regents' Committee turned to the subject of discipline and asserted that there was no basis in the facts presented for any punishment greater than censure and reprimand: '' While the Board of Regents is vested with wide discretion as to the measure of discipline on the facts of a particular disciplinary proceeding,'' the Committee wrote, '' the imposition in any instance of discipline beyond the statutory minimum of censure and reprimand must * * * be based either on the inherent nature of the respondent's violation of the disciplinary statute

or on an evidentiary showing that the respondent's conduct justifies more than the minimum discipline." And it ended its report in this way: " Since violation of the Federal statute which [appellant] has been convicted of violating involves inherently no moral turpitude, and since there has been no impeachment by evidence of [appellant's] explanation (sufficient if unimpeached) of his failure to produce the subpoenaed documents, we find in the record no valid basis for discipline beyond the statutory minimum of censure and reprimand; and we therefore recommend that [appellant's] license be not suspended, as the Medical Committee on Grievances has recommended, but that he be censured and reprimanded."

The Board of Regents, however, disregarded that recommendation.[3] Instead, giving no reason whatsoever for its action, it confirmed the recommendation of the Medical Committee on Grievances — made, it must be remarked, on a record less complete than the one before the Committee on Discipline. (See, *supra*, fn. 1, p. 101.)

This court has heretofore declined, in most instances, to consider the measure of discipline imposed by an administrative agency. (But cf. *Matter of Tompkins* v. *Board of Regents,* 299 N. Y. 469, 476–477, where, instead of reinstating determination of Board of Regents, which had been annulled by Appellate Division, this court, upon reversing Appellate Division, remitted matter to the Board so that it might reconsider the measure of discipline.) That is a subject, we have concluded, that rests in the discretion of the agency. However, there is no more reason here, than with other discretionary matters, why some limit should not be imposed on the exercise

3. While it is impossible to say what prompted the Regent's acceptance of the Medical Grievance Committee's recommendation that appellant's license be suspended for six months, it may be of some significance that, among the findings made by the Grievance Committee, and confirmed by the Regents, was the finding that " Ever since 1947, the Committee [Anti-Fascist Refugee Committee] has been listed as subversive by the Attorney General of the United States." Reliance upon that fact was, of course, improper, for, as the Committee on Discipline pointed out, that listing was entitled to no weight whatsoever in the present proceeding, and its utilization constituted gross and prejudicial error. (See *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123.)

of discretion, and judicial review sanctioned, where that exercise is unsupportable on rational grounds and becomes arbitrary and capricious. If the statutory authority of the Regents is, in truth, as the court here holds,[4] so broad, so unrestrained, then, I venture, the statute exceeds constitutional limits.

It is not without relevance to observe that, in the process of time, practically every calling necessitating skill has been subjected in some measure to the requirements of a license. The lawyer and the physician have been followed by the dentist, the teacher, the barber, the plumber and many others. It may not be long before the list embraces the butcher and the baker. To what extent the public interest requires protection from incompetent or dishonest practitioners of medicine or of plumbing is, of course, for the legislature to decide. But there can be no gainsaying the fact that the legislature advances into the frontiers of the individual's constitutional right to liberty and property, when it undertakes to deprive a man of his profession or his trade for reasons unconnected with its proper exercise. (Cf. *Bartos* v. *United States District Court*, 19 F. 2d 722.)

In sum, then, the court's construction of the Education Law provision, particularly when taken with its grant to the Board of Regents of uncontrolled discretion, not only as to the matters on which they may rely in reaching a determination, but also as to the measure of discipline, places the statutory scheme beyond the bounds of what is permitted to the legislature. To me, it seems not merely delegation run riot but legislative abdication.

To be sure, as the court remarks, something may — and I assume must — be left to " the good sense and judgment " of the Regents, but, while " good sense and judgment " are essential qualities for members of an administrative board, they certainly do not furnish any guide or standard for administrative action. The fact that " crime " has been committed *somewhere* is too vague, too capricious, too unrelated to anything

---

4. In the course of its opinion, the court has written: " As to the assertions, by appellants, that the Regents dealt too severely with them, or that the Regents, in deciding on punishment, ignored weighty considerations and acted on matters not proper for consideration, it is enough to say that we are wholly without jurisdiction to review such questions " (*supra,* p. 99, emphasis supplied).

that a citizen of our state is entitled to have considered, to be regarded as a standard for any legislation, much less for legislation that is said to authorize a penalty that may destroy a person professionally, that may result in the loss " of all that makes life worth living." (*Ng Fung Ho* v. *White,* 259 U. S. 276, 284.) In *Matter of Small* v. *Moss* (279 N. Y. 288, 299), we declared that " The Legislature must set bounds to the field, and must formulate the standards which shall govern the exercise of discretion within the field. Without the second rule as a corollary to the first rule there would be no effective restraint upon unfair discrimination or other arbitrary action by the administrative officer ", and in *Packer Collegiate Inst.* v. *University of State of N. Y.* (*supra,* 298 N. Y. 184, 189), after quoting that passage, we stated that " there must be a clearly delimited field of action and, also, standards for action therein." (See, also, *Niemotko* v. *Maryland,* 340 U. S. 268, 273; *Matter of Fink* v. *Cole,* 302 N. Y. 216, 225.) The wisdom of that constitutional safeguard is highlighted by its disregard in this case.

For his federal offense, appellant has served a jail sentence. Unless the nature of the criminal statute or the circumstances of its infraction or some other evidentiary fact casts doubt upon his character or upon his past or anticipated conduct as a physician, his further suspension from practice is truly an additional penalty for that single offense, rather than the regulation of medical practice in the public interest. (Cf. *Ex parte Garland,* 4 Wall. [U. S.] 333, 377.) The facts found by the Regents' Committee on Discipline, not challenged either by the Regents or by this court, prevent any other conclusion.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DYE and FROESSEL, JJ., concur with DESMOND, J.; FULD, J., dissents in opinion.

Orders affirmed. [See 305 N. Y. 691.]